**UNITED STATES, Appellant,**

**v.**

**Edward J. HOLMES, Appellee.**

**No. 11084.**

District of Columbia Court of Appeals.

Argued April 21, 1977.

Decided Dec. 12, 1977.

---

William J. O'Malley, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease and Barry L. Leibowitz, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Mildred M. Matesich, Public Defender Service, Washington, D. C., for appellee.

Before KELLY, KERN and MACK, Associate Judges.

KERN, Associate Judge:

This is a government appeal from the trial court's suppression, after taking testimony and hearing argument before trial, of certain incriminating statements made by appellee about two pending and unsolved District of Columbia homicides while he was undergoing interrogation by police in Maryland about a murder committed earlier that day in Prince George's County.

The record reflects, and the trial court so found, that the disappearance of a child from a County elementary school on the morning of November 27, 1973, set off a wide-spread search by Maryland police; they unearthed information that she had been seen near the school that morning with a man whose description caused the police to check with appellee's parents who lived in Clinton; and, the parents confirmed that appellee had indeed been there that morning wearing clothing "similar" to the man described as having been with the missing child. The County police visited appellee's aunt, with whom he was living in the District of Columbia, at about 6 p.m. on the 27th and she told them that he would be returning by bus from work about 10:30 p.m. and would disembark at the stop at 55th and East Capitol Streets. The body of the child, bludgeoned to death, was discovered at approximately 7 p.m. in the vicinity of the woods where she had been seen alive with the man suspected of being appellee. The Maryland officers neither obtained nor sought an arrest warrant before meeting with District police at that bus stop in northeast Washington; rather, they advised the Metropolitan police officers of their intention to take appellee to Prince George's County for questioning concerning the murder of the child and requested their presence at that place at that time.

When appellee alighted from the bus at about 10:30 p.m. on the night of November 27, he was surrounded at once by a half-dozen uniformed and/or armed police; District Detective Harris spoke first and, after identifying himself, advised appellee that the Prince George's officers wanted to speak with him "as a witness to a homicide but that he could refuse to go to Maryland." County Detective Hatfield then identified himself and "asked Holmes [appellee] if he was willing to go to Prince George's County." Appellee, "without comment or question," answered "solid" to the District officer and "yes" to the Maryland officer. Three or four police vehicles and some dozen policemen were in the immediate area of the bus stop and appellee was "walked" to one of the Prince George's County cruisers, frisked, handcuffed and placed in the rear seat. Again, County Detective Hatfield identified himself, and then told appellee he was "wanted for questioning" and "could stay in the District of Columbia or go voluntarily to Maryland. The word 'extradition' was used." Thereupon, asked if he understood his rights, appellee replied, "yes."

Appellee was unhandcuffed and driven to the Bureau of Criminal Investigation in Forestville, Maryland. There, he was placed in an interrogation room, his clothes

were removed, and pubic hair sampling taken. Then, clad in jail clothing, he was interrogated by County Detective Nelson from about midnight to about 3 a.m. This interrogation occurred in two parts: the first stage lasted about one and a half hours, only appellee and the detective were present, and nothing of what was said was recorded; and then some two hours more of interrogation of appellee was conducted and recorded on a tape recorder by Detective Nelson. The third and final interrogative stage was conducted by two District detectives whom Nelson alerted because appellee not only had confessed to the murder of the child on that particular day, but also during his interrogation he admitted to two pending and unsolved District homicides. At 4:30 a.m., the questioning of appellee came to an end with his reading and signing a 14-page statement handwritten by District Detective Sharkey.

The government, at the pretrial suppression hearing, produced as witnesses a number of police officers but was unable to present (1) County Detective Nelson who had been both the initial interrogator and the one with appellee for the longest period of time during the night; (2) the tape recording of Nelson's second segment of questioning appellee; or (3) the written statement signed by appellee which the third segment of questioning, *viz.*, between 3:00 and 4:30 a.m. by the District detectives, had produced.[1]

The trial court concluded that appellee's oral and written statements must be suppressed because:

Holmes was arrested without probable cause by Maryland officers in the District of Columbia. Police failed to present Holmes to a District of Columbia court in accord with statutory provisions. There was ineffective inquiry into Holmes' understanding of his rights. Holmes was intensively interrogated for some four hours in the middle of the night after being whisked from a bus stop in the District of Columbia to a Maryland police facility, stripped of his clothing and caused to give pubic hair samples. In sum, the police created and exploited circumstances which resulted in legally inadmissible statements.[2]

The government vigorously challenges the trial court's conclusion that the Maryland police lacked probable cause to arrest appellee as he stepped from the bus on the night of November 27, 1973. Its argument thereby concedes, as we think it must, that the action of the Prince George's County police in placing appellee, handcuffed, into their cruiser and driving him to Forestville for questioning constituted an arrest, despite the fact that they themselves characterized their intrusion as only the questioning of a material witness. Proceeding, then, upon the premise that this was an arrest by Maryland police within the District of Columbia by an out-of-state officer, we note that this court has heretofore made clear that such an arrest is valid *only* under authority of the Uniform Act on Fresh Pursuit, D.C.Code 1973, § 23–901 *et seq. District of Columbia v. Perry,* D.C.App., 215 A.2d 845 (1966).

Section 23–902 of this Act mandates that when an out-of-state officer effects an arrest in fresh pursuit[3] within the District of

---

1. The government did present testimony by officers who had listened to the tape recording of Nelson's "second stage" of interrogation and a typewritten statement purporting to be a copy of the handwritten statement appellee had signed and read. This copy had been prepared by a police typist from the handwritten statement which District Detective Sharkey had read to her.

2. Appellee was convicted in the Maryland court for the murder of the child.

3. "Fresh pursuit" is defined by the Act, among others, to imply "not necessarily . . . an instant pursuit, but pursuit without unreasonable delay." D.C.Code 1973, § 23–903. *See Boddie v. State,* 6 Md.App. 523, 252 A.2d 290 (1969). In assessing whether the pursuit here was "without unreasonable delay," we note that the body was discovered at 7 p.m. in the vicinity of the wooded area near the school where a man whose description matched that of appellee had been seen with decedent earlier in the day; and, appellee arrived from work near the house where he was living at 10:30 p.m. We assume for the purpose of the instant

Columbia, "he shall without unnecessary delay take the person arrested before a judge of the Superior Court of the District of Columbia, who shall conduct a hearing for the purpose of determining the lawfulness of the arrest." The judge must then, after such hearing, order the arrestee discharged if he finds the arrest was "unlawful" or follow normal extradition procedures, see D.C.Code 1973, § 23–702, if he determines the arrest was "lawful."

It is conceded that the Prince George's County police, in the company of Metropolitan Police officers, transported appellee immediately upon arresting him within the District to the Bureau of Criminal Investigation in Forestville; they did not take him to a judge of the Superior Court as the Act requires in the case of a fresh pursuit arrest by an out-of-state officer. The government urges (Brief at 16) that: "Based on the evidence presented to the trial court there can be no other conclusion but that appellee waived his statutory right to extradition." However, the trial court found to the contrary:

    a. From the moment Holmes alighted from the bus, his freedom of movement was restrained in that he was surrounded by law enforcement personnel and would not have been permitted to leave.

    b. Statements to Holmes indicating that he could remain in the District of Columbia were meaningless in these circumstances.

        (i) Holmes was almost instantly surrounded by Maryland police and placed in handcuffs in a Maryland police cruiser.

        (ii) A brief "you don't have to go" from a plainclothes detective followed by such terms as "extradition" is not meaningful advice of a right to remain in the District.

    c. Under all of the circumstances, Holmes' monosyllabic responses of "solid" and "yes" cannot be interpreted as an exercise of independent choice or as a consent to return to Maryland with the Prince George's County officers.

Accordingly, we must determine whether the trial court's finding, viz., that appellee's consent to accompany the Maryland officers without an extradition hearing was not voluntary "[u]nder all of the circumstances," was clearly erroneous.

The record demonstrates that the trial court in making such finding considered the circumstances that (1) the police took appellee into custody immediately upon his alighting from the bus before addressing him; (2) there were a dozen officers from both police departments (the victim was the child of a Prince George's County policeman) surrounding appellee in a noticeable show of force; (3) neither officer who thereafter spoke to appellee explained his right to a hearing before a District of Columbia judge to determine the lawfulness of the arrest, as provided by the Act, nor did they explain what an extradition proceeding was;[4] (4) the Prince George's County officer who confronted and spoke to appellee admitted at the pretrial suppression hearing that he and his companions would not have permitted appellee to go his own way from the bus stop had he refused to accompany them; (5) neither officer speaking to appellee even advised him that he had become, by reason of the events of the day, the prime suspect in the child's murder; and (6) appellee's "monosyllabic" replies to the District detective's advice that the Maryland police wanted him to go with them for questioning about a homicide but he could refuse to go, and the County detective's question whether he was willing to go with them was no indication of knowing and voluntary consent.

case that the Maryland police pursuit was "without unreasonable delay" and hence "in fresh pursuit."

4. The government asserts that the trial court based its finding of the involuntariness of appellee's consent to give up his right to hearing and extradition and go with the officers on the sole ground they failed to advise him of his right not to consent. The record reflects, to the contrary, that the court considered the totality of circumstances surrounding appellee's going with the officers to Maryland in determining whether his action was voluntary.

We are of opinion that the trial court applied the correct test, *viz.,* the "totality-of-circumstances" test, in determining whether appellee's consent to leave the District after arrest without a hearing and extradition was voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Given the evidence of record we are unable to say that the court's finding that appellee's consent was unknowing and involuntary is plainly wrong.

Accordingly, the trial court's order must be and is

*Affirmed.*[5]

**5.** In light of our disposition, we need not reach the question of the propriety of the trial court's further conclusions that appellee's incriminating statements were (1) invalid due to an improper *Miranda* warning, *Miranda v. Arizona,* 384 U.S. 436, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 436 (1966), and (2) involuntary, resulting from police coercion in the form of lengthy and intensive questioning late at night without adequate warning to him of his rights.