Dominique E. OUTLAW, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–1042.

District of Columbia Court of Appeals.

Argued June 18, 2002.

Decided Sept. 5, 2002.

Michael Madden, appointed by the court, for appellant.

Susan H. Rhee, Assistant United States Attorney, with whom Roscoe C. Howard, United States Attorney, and John R. Fisher, Roy W. McLeese III, and Amanda Haines, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and REID, Associate Judges, and KING, Senior Judge.

REID, Associate Judge:

Appellant Dominique E. Outlaw challenges his convictions on the lesser included offense of second-degree murder, possession of a firearm during a crime of violence, and carrying a pistol without a license.[1] He primarily contends that the trial court erred by not suppressing his videotaped confession due to a violation of his procedural rights relating to extradition from the State of Maryland. We hold that the trial court erred in finding no violation of federal rules governing extradition and the right to a probable cause hearing in the jurisdiction of arrest (Mary-

land), where Mr. Outlaw signed a waiver form after being given materially inaccurate information pertaining to his procedural rights. Finding no prejudice, however, we affirm his convictions and the trial court's denial of his motion to suppress his videotaped confession because: (1) Mr. Outlaw received comparable rights in the District of Columbia to the federal procedural extradition rights since his arrest warrant was based on probable cause and he subsequently had a preliminary, probable cause hearing in the District; (2) there was no unnecessary delay in presentment; and (3) he voluntarily and knowingly waived his *Miranda* rights in the District. Mr. Outlaw also argues that his convictions should be reversed because the trial court failed to give the jury his requested self-defense instruction. We conclude that if such error occurred, it was harmless.

## FACTUAL SUMMARY

Testimony given at a hearing to suppress Mr. Outlaw's videotaped confession shows that on August 17, 1999, he was arrested at his home in Capitol Heights, Maryland on a District of Columbia warrant relating to the fatal shooting of James Stocks in the District on April 15, 1999. Present at the time of Mr. Outlaw's arrest were District of Columbia Metropolitan Police Department ("MPD") detectives, FBI agents, and several Prince George's County police officers. FBI Agent John Cox, MPD Detective Johnny Watson and others went to the basement of Mr. Outlaw's residence. Agent Cox

> explained to [Mr. Outlaw] that he had a right to be brought to a court in Maryland where he could basically contest his

---

1. Mr. Outlaw was indicted on charges of first-degree murder while armed (premeditated), in violation of D.C.Code § 22–2401, 3202 (1996); possession of a firearm during a crime of violence ("PFCV"), in violation of § 22–3204(b); and carrying a pistol without a license ("CPWL"), in violation of § 22–3204(a). He was sentenced to concurrent terms of twenty years to life for second-degree murder while armed; five to fifteen years for PFCV; and twenty months to five years for CPWL.

identity. If he wasn't the person wanted in the warrant, he could contest that. If the Court determined that he was the person wanted in the warrant, then the agency that wanted him would have a certain number of days to come pick him up and bring him to the jurisdiction that wanted him, ... the District of Columbia. Or, he could sign the form and go straight to the District of Columbia.... Mr. Outlaw signed the waiver form.[2] Contrary to Mr. Outlaw's testimony, Agent Cox denied "threaten[ing Mr. Outlaw] into signing the [waiver] form" which permitted his transport to the District. Agent Cox and Detective Watson also signed the form as witnesses.

Agent Cox was "not sure" whether he used the words "extradition hearing" in explaining Mr. Outlaw's rights, and "[did not] recall" whether he told Mr. Outlaw that he had a right to a preliminary hearing, or explained the nature of a bond hearing. Nonetheless, he "discuss[ed] [extradition] with [Mr. Outlaw] in substance." Mr. Outlaw maintained that Agent Cox told him not to say anything because law enforcement agents were aware that he acted in self-defense.

Detective Watson, who was assigned to the team investigating the death of Mr. Stocks, also testified at the suppression hearing. As part of his duties as a member of the investigating team, Detective Watson assembled a photo array, which included the picture of Mr. Outlaw. He showed the photo array to various witnesses. One of the witnesses, who had known Mr. Outlaw for about a year, viewed the photo array and stated, without hesitation: "That's Dominique [Outlaw], the one who shot James [Stocks]." The witness was located across the street from the site of the shooting, had an unobstructed view in good lighting, and saw Mr. Outlaw fire a gun at Mr. Stocks. A second witness who looked at the photo array commented: "[T]hat's the one who shot James. That's the one who beat up my stepson." That witness, who also had known Mr. Outlaw for more than one year and who was approximately fifteen feet away from Mr. Outlaw at the time of the shooting, identified Mr. Outlaw's photograph.[3]

When asked what Mr. Outlaw had been told about his rights to have an extradition hearing, Detective Watson testified that he was informed of his "right to an extradition hearing and he was showed this [waiver] form and they explained to him the form." Initially, he did not "recall" whether Mr. Outlaw was advised that "he had the right to an attorney." Upon additional questioning by defense counsel, Detective Watson acknowledged that Mr. Outlaw was not advised of his right to an attorney at the extradition hearing, and that the waiver of rights form did not mention an extradition hearing.[4]

2. The waiver form stated:

I, Dominique Outlaw, do hereby waive my right to appear before a United States Magistrate Judge in the District of Maryland, in lieu of an appearance before a United States Magistrate Judge in the District of Columbia, for the express purpose of expediting a bond hearing, an initial appearance or any other hearing that I may be entitled to under law.

3. The three-page affidavit in support of the arrest warrant for Mr. Outlaw summarized the testimony of these witnesses who were referred to as Witness One and Witness Two. Witness Two saw Mr. Outlaw shoot Mr. Stocks in the back while he (Mr. Stocks) was on the ground. Witness One came out of his or her home upon hearing two shots, and observed Mr. Outlaw standing over Mr. Stocks with a gun in his hand. The witness watched while Mr. Outlaw shot Mr. Stocks in the back four times.

4. Detective Watson thought that he saw the word "extradition" but the word on the waiver form was "expediting."

After he executed the waiver form in Maryland, Mr. Outlaw was taken to Detective Watson's vehicle; Detective Gina Powell also was present. Detective Watson stated: "[W]e sat with him in my vehicle, and then we transported him to the Cold Case Unit" in the District, at 300 Indiana Avenue, N.W. At 7:27 a.m., Mr. Outlaw signed a waiver of rights card, which was witnessed by Detectives Watson and Powell. There was no indication that Mr. Outlaw did not understand the waiver of rights card. In response to questions three and four on the card, he indicated that he did not wish to answer any questions, and that he was unwilling to answer any questions without the presence of a lawyer. After being told that the detectives could not talk with him in light of his responses to questions on the waiver of rights card, Mr. Outlaw "said he wanted to talk about the case." Detective Watson told Mr. Outlaw that, "if he want[ed] to talk about it, the[n] he [would] have to change his answer three and four to, yes." Mr. Outlaw changed his responses to those questions at 7:30 a.m. He claimed that he changed his responses because Agent Cox pressed him to reveal what had happened when Mr. Stocks was killed, and also pushed him in the chest while he was handcuffed to a chair, causing him to teeter backwards and injure his leg on a table.

Mr. Outlaw was questioned from 7:30 a.m. to 10:00 a.m. He then decided to make a videotaped statement, rather than allowing the detectives to take his statement. The videotaped statement began around 10:00 a.m. and lasted approximately fifteen minutes. Mr. Outlaw described why and how he shot Mr. Stocks. At the end of the videotape, he was asked about the waiver of rights card and the change he made to his responses. He acknowledged that he changed his answers, and initialed the changes, so that he could speak with the law enforcement agents. When asked if anyone "harrass[ed]" him "or ma[d]e [him] ... talk to" the law enforcement agents, or "threaten[ed]" him, he responded, "No, sir." He also agreed that he was "treat[ed] ... respectfully" and offered food and drink. In response to the question: "[D]id we also unhandcuff you[,]" Mr. Outlaw said: "Yes, sir."

At the conclusion of the suppression hearing and after remarking that there were some inaccuracies and flaws in the information given to Mr. Outlaw in Maryland, the trial judge concluded, in part:

> Given the facts of this case[,] and the Court has to consider the totality of the circumstances[,] and the totality of the circumstances are that this defendant, Mr. Outlaw, doesn't appear to have any mental problems, doesn't appear to have any deficiencies in his ability to understand things and he was told that he could stay and go before a judge in Maryland for purposes of determining whether or not he would be removed back to [the District of Columbia]. He wasn't told of what the standard would be for determining that, but that he could have a hearing there.
>
> . . . .
>
> I think there are some flaws, but the Court is satisfied that the totality of the circumstances indicate that he was aware that he could have a hearing before being removed to the District of Columbia and that hearing could be in the State of Maryland if he chose to do so or he could choose to come back to the District of Columbia at that time, which could expedite matters.
>
> And the Court is satisfied that given the totality of the circumstances that he knowing[ly] and voluntarily waived his right to an extradition hearing in Maryland.

The trial court also rejected Mr. Outlaw's contention of coercion, stating in part:

[T]he Court observed [Mr. Outlaw] during the videotape and he appeared to be comfortable in his surroundings, appeared to be unharmed. In fact, his own words at the end of the videotaped statement[] ... say[] that he was treated fairly by the officers.

So given that, coupled with Detective Leadmon's testimony, the Court is led to believe that he was not physically assaulted before he gave the statement.

The trial court then specifically found that there was no "coercion or threats" that led to Mr. Outlaw's statement.

## ANALYSIS

■ Mr. Outlaw first concentrates on his alleged waiver of procedural rights under the Federal Rules of Criminal Procedure. He argues that, "the voluntariness of the suspect's waiver of procedural rights (relating to asportation across jurisdictional lines) is a threshold issue to be determined before the trial court even evaluates the voluntariness of any subsequently obtained statements." He maintains that the trial court erred by concluding that he voluntarily waived his procedural rights under Fed.R.Crim.P. 40(a) and related rules. As he states in his brief:

> The trial court in the instant case erred in finding that the appellant voluntarily accompanied the arresting officers to the District of Columbia and thereby voluntarily waived his right to the procedures he was entitled to under Federal Rules 40, 5(c), and 5.1, because those procedures entailed a right to a preliminary hearing and a right to counsel. It was undisputed at trial that the appellant was never informed of his right to a preliminary hearing and [was] never informed of his right to counsel.

In response, the government contends that because Mr. Outlaw "voluntarily agreed to be returned to the District of Columbia without a removal hearing under Fed.R.Crim.P. 40(a) ... [,] there was no R. 40 violation." Furthermore, even if Mr. Outlaw was subjected to a Rule 40 violation, "suppression of [his] statements would not be an appropriate remedy," in part, because Mr. Outlaw "cannot demonstrate that he suffered any consequences from the failure to advise him of his right to a probable cause hearing." In addition, since the warrant for Mr. Outlaw's arrest was based on probable cause, supported by eyewitness identification, he suffered no prejudice due to the absence of a probable cause hearing in Maryland.

We review matters of law *de novo;* factual findings of the trial court are binding unless they are plainly wrong or clearly erroneous, or without evidence to support them. *See* D.C.Code § 17–305 (2001). We examine the totality of the circumstances to determine the validity of a waiver with respect to rights accorded a suspect under Fed.R.Crim.P. 40(a), 5 and 5.1. *Hagans v. United States,* 408 A.2d 965, 967 (D.C. 1979).

Fed.R.Crim.P. 40(a) specifies, in pertinent part, that a person arrested outside the district in which an offense is alleged to have occurred:

> [S]hall be taken without unnecessary delay before the nearest available magistrate judge, in accordance with the provisions of Rule 5. Preliminary proceedings concerning the defendant shall be conducted in accordance with Rules 5 and 5.1, except that if no preliminary examination is held because ... the defendant elects to have the preliminary examination conducted in the district in which the prosecution is pending, the person shall be held to answer upon a finding that such person is the person named in the indictment, information or warrant.

Rule 5(a) mandates that an arresting officer "shall take the arrested person without unnecessary delay before the nearest

available federal magistrate judge...." Rule 5(c) provides that: "A defendant is entitled to a preliminary examination, unless waived, when charged with any offense, other than a petty offense...." Under Rule 5.1(a), a probable cause finding must be made, if a preliminary examination takes place, to ascertain whether "there is probable cause to believe that an offense has been committed and that the defendant committed it...." A related D.C.Code provision, § 23–563(c) (2001), directs that

> A person arrested outside the District of Columbia on a warrant issued by the Superior Court of the District of Columbia shall be taken before a judge, commissioner or magistrate, and held to answer in the Superior Court pursuant to the Federal Rules of Criminal Procedure as if this warrant had been issued by the United States District Court for the District of Columbia.

*See also* Super. Ct.Crim. R. 5–I (2002); *Hagans, supra,* 408 A.2d at 967 n. 3.

In *Hagans, supra,* we focused on whether a defendant had to be taken before a federal magistrate to execute a waiver of extradition. We said that the defendant's "removal to the District" was governed by Fed.R.Crim.P. 40(a), rather than Maryland extradition law, and that "the federal rules do not require that a waiver of an arrestee's right to ... a [preliminary examination/probable cause] hearing be executed in the presence of a magistrate." 408 A.2d at 967 (citing Fed.R.Crim.P. 5(a) and (c)). We then looked to see "whether appellant's waiver was given knowingly and voluntarily under the totality of the circumstances." *Id.* (referencing *United States v. Holmes,* 380 A.2d 598, 602 (D.C.1977) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

In the earlier *Holmes* case, we held that "[The defendant's] consent to accompany the Maryland officers without an extradition hearing was *not* voluntary 'under all of the circumstances'...." 380 A.2d at 601 (emphasis in original). We also determined that the trial court's conclusion regarding the totality of the circumstances was subject to a "clearly erroneous" standard of review. *Id.*

Here, Fed.R.Crim.P. 40(a), 5 and 5.1(a) require that, at the time of arrest, a person in Mr. Outlaw's situation be taken "without unnecessary delay" to a federal magistrate for a preliminary examination to determine whether "there is probable cause to believe that an offense has been committed and that the defendant committed it...." Neither Agent Cox nor Detective Watson advised Mr. Outlaw accurately about the rights embodied in these rules. Indeed, the trial court recognized that the information imparted to Mr. Outlaw was flawed regarding the type of hearing required, and the purpose of the extradition hearing, when it declared:

> [T]he facts in this case on the waiver ... of the extradition hearing[,] ... which the Court credits[,] are as follows: That the defendant was told in the State of Maryland ... that he had the right to go before a Court in Maryland and that the purpose of going before that Court would be ..., which I think is not the correct purpose ..., would be to contest his identity.

Rather than a proceeding "to contest his identity," Mr. Outlaw was entitled to a probable cause hearing under the federal rules. A probable cause hearing centers on (a) whether "an offense has been committed" and (b) whether "the defendant committed it." Fed.R.Crim.P. 5.1(a).[5]

---

**5.** There was some question as to whether Agent Cox referred to the Rule 5 and 5.1 hearing as a bond hearing. Even if he did, a bond hearing is not the same as the required probable cause hearing.

While the waiver form that Mr. Outlaw signed could have been an accurate delineation of his rights under Rules 40(a), 5 and ·5.1, it was not. The trial judge even commented: "[Y]ou would think that the waiver form would be more sufficient than this ..." and, the waiver form "could be better when we're dealing with extradition...." The waiver form referred to Mr. Outlaw's right to appear before a magistrate judge in Maryland "for the express purpose of expediting a bond hearing, an initial appearance or any other hearing ... [to which Mr. Outlaw might] be entitled to under law." Not only was the reference to "expediting a bond hearing" incorrect, but the open-ended reference to other possible hearings, without specification, was ambiguous.

In contrast with the waiver form signed by Mr. Outlaw, the one signed by the appellant in *Hagans, supra,* specifically mentioned the right to "an extradition hearing before being returned to the District of Columbia to face charges there being filed against me." 408 A.2d at 966. The form also included the following:

> I have been advised as to exactly what an extradition hearing means, and how it applies to me in this particular situation.

> I have been shown a copy of the warrant affidavit, and have been advised of the charge of felony murder. I made no statement concerning the case at this time, and have been advised of my constitutional rights. I have been told that I could have a lawyer present and request none at this time.

> I willingly return to the District of Columbia with [a MPD detective]. I voluntarily waive my right to have an extradition hearing.

As we noted, the only error in the explanation provided to the appellant in *Hagans* was that he would be taken before a Maryland magistrate rather than a federal magistrate. *Hagans, supra,* 408 A.2d at 965. The errors in the information provided to Mr. Outlaw, however, deviated substantially from the requirements of Rules 40(a), 5, and 5.1. In fact, the trial judge declared that Mr. Outlaw "wasn't given totally accurate information about what the hearing would be about."

In summarizing the reason for concluding that Mr. Outlaw knowingly and voluntarily waived his right to an extradition hearing, the trial court highlighted only the right to a "hearing." "He was aware that he could have a hearing before being removed to the District of Columbia and that hearing could be in the State of Maryland...." But Mr. Outlaw had a right to a probable cause hearing, and the right not to be misled by inaccurate information. Therefore, the trial court's finding of a voluntary and knowing waiver was clearly erroneous or plainly wrong, because Mr. Outlaw's waiver was based on materially inaccurate information, and therefore, was not effective.[6]

■ This does not end our inquiry, however, since we must determine the impact of the error. ·Mr. Outlaw urges us to adopt a per se prejudice rule, holding that because he was not provided complete and

---

**6.** Since we conclude that Mr. Outlaw's waiver was ineffective because it was based on inaccurate information, we need not resolve the issue as to whether the proper standard to be applied in the District to examine the validity of the waiver is simply one of "voluntariness," or something more, such as: (1) a "voluntary, intelligent and knowing" standard, *see Hagans, Holmes, supra;* or (2) a combination of "voluntariness" with the assessment of whether the defendant had at least "some rudimentary understanding of the rights being relinquished," *see Buchanan v. City of Kenosha,* 90 F.Supp.2d 1008, 1015 (E.D.Wis.2000); *see also State v. Soto,* 340 N.J.Super. 47, 773 A.2d 739, 746 (App.Div. 2001) (citations omitted).

accurate information about his procedural rights under Rules 40(a), 5, and 5.1, his videotaped statement must be suppressed and his conviction reversed. The government takes the position, however, that suppression of Mr. Outlaw's videotaped statement is inappropriate in this case. We agree.

Mr. Outlaw has failed to establish that he was prejudiced because of his waiver on the basis of inaccurate information. He was arrested on a warrant reflecting probable cause due to his identification by two eyewitnesses as the person who fatally shot Mr. Stocks. On appeal, he has not contested the eyewitness identifications which served as the basis for issuing the warrant for his arrest. In addition, although he did not have a probable cause hearing in Maryland, he was taken before a judge in the Superior Court of the District of Columbia on August 18, one day after his arrest in Maryland. At that time, he was scheduled for a preliminary hearing on August 30, 1999. At the hearing on August 30, "probable cause" was found. Thus, Mr. Outlaw received the probable cause hearing to which he was entitled under the federal rules, and he was not prejudiced by his waiver of rights on the basis of inaccurate information.

Mr. Outlaw next argues that the trial court's finding that his videotaped confession was voluntary is not supported by substantial record evidence. He contends that he did not voluntarily waive his *Miranda* rights,[7] and that his rights under the *Mallory/McNabb* doctrine[8] were violated, because of the lapse of time between his arrest in Maryland and his statement in the District of Columbia. In essence, he attempts to tie events in Maryland to his claim of an involuntary statement in the District of Columbia.

■ We already have addressed Mr. Outlaw's arguments regarding the procedures in Maryland, and have concluded that the flaws in those procedures do not warrant suppression of his videotaped statement. Similarly, our review of the events following Mr. Outlaw's arrest and transport to the District leaves us unpersuaded by Mr. Outlaw's arguments. Initially, he declined to waive his *Miranda* rights, but then indicated that "he wanted to talk about the case." Consequently, he personally changed responses on his *Miranda* waiver card so that he could speak with the law enforcement officers. During his videotaped statement, he was asked whether he was threatened, or harassed into speaking with the officers. He replied, "No sir." The record shows that Mr. Outlaw made his videotaped statement freely and without constraint. *See Schneckloth, supra,* 412 U.S. at 225–26, 93 S.Ct. 2041; *see also Martin v. United States,* 567 A.2d 896, 905–06 (D.C.1989).

■ Not only was Mr. Outlaw's videotaped statement made freely and without constraint, but the three hours between his arrest and the videotape did not transform his statement into an involuntary one. At the outset, we note that Mr. Outlaw made no complaint at the hearing on his suppression motion about the lapse of time between his arrest and statement. Equally important, D.C.Code § 4–140(b) (1999)[9] specified that:

> Any statement, admission, or confession made by an arrested person within 3 hours immediately following his arrest shall not be excluded from evidence solely because of delay in presentment.

7. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8. *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *McNabb*

*v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

9. Recodified as D.C.Code § 5–115.01 (2001).

The federal statute governing present-ment embodies a six-hour rule. *See* 18 U.S.C. § 3501(c). However, the six-hour limitation "shall not apply in any case in which the delay in bringing such person before . . . [the] magistrate or other officer beyond [the] six-hour period is found by the trial judge to be reasonable consider-ing the means of transportation and the distance to be traveled to the nearest available . . . magistrate or other officer." We need not determine the applicability of this provision,[10] because the prohibition against unnecessary delay reflected in the Mallory/*McNabb* doctrine, and in Fed. R.Crim.P. 5(a), may be waived. "[W]e have held repeatedly that 'a valid waiver of an individual's *Miranda* rights is also a waiver of his *Mallory* right to presentment without unnecessary delay.' The waiver is valid even if obtained during the period of unnecessary delay." *United States v. Bell,* 740 A.2d 958, 963 (D.C.1999) (citing *Ever-etts v. United States,* 627 A.2d 981, 986 (D.C.1993), *cert. denied,* 513 U.S. 848, 115 S.Ct. 144, 130 L.Ed.2d 84 (1994); and quoting *Bond v. United States,* 614 A.2d 892, 899 (D.C.1992) (internal quotation marks and citations omitted)).

Here, the exact time between arrest and presentment in the District is not crystal clear because there are no findings of fact concerning that time period. The record shows that Mr. Outlaw was arrested on August 17, 1999, and appeared in a court in the District on August 18, 1999. In *Bond, supra,* the confession was deemed admissible even though it was made thirty-six hours after arrest and during a sixty-two hour presentment delay. 614 A.2d at

899, 901. The delay in Mr. Outlaw's case was less than thirty-six hours. Therefore, we are unpersuaded by his excessive delay argument.

 Finally, Mr. Outlaw maintains that he was entitled to a self-defense in-struction. We dispose of this argument summarily. While a defendant generally "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," *Jackson v. United States,* 645 A.2d 1099, 1102 (D.C.1994) (ci-tation and quotation marks omitted), we cannot say on this record that Mr. Outlaw was entitled to a self-defense instruction. He walked away from a confrontation with Mr. Stocks, went to a truck, retrieved a gun, and returned to shoot Mr. Stocks multiple times, fatally wounding him. This behavior is inconsistent with at least two factors showing entitlement to a self-de-fense instruction—that he "honestly and reasonably believed that he was in immi-nent danger of death or serious bodily harm"; and that "[his] response was nec-essary to save himself from danger." *Brown v. United States,* 619 A.2d 1180, 1182 (D.C.1992) (citations omitted); *see also Sams v. United States,* 721 A.2d 945, 953 (D.C.1998) ("[S]elf-defense is not avail-able to a defendant who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble even if his purpose in putting him-self in that position was benign.") (refer-ences omitted), *cert. denied,* 528 U.S. 1135, 120 S.Ct. 977, 145 L.Ed.2d 928 (2000).

 Although the trial court did not give a self-defense instruction,[11] it instruct-

---

**10.** *See Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); the United States Supreme Court there held that *Miranda* articulated a constitutional rule, and a congressional statute may not super-sede a Supreme Court decision which inter-prets the Constitution of the United States.

530 U.S. at 437, 120 S.Ct. 2326 (reference omitted).

**11.** While the trial judge and counsel were discussing jury instructions, and specifically whether instructions would be given on lesser included offenses such as second-degree mur-

ed the jury on mitigation of malice or intent, and the defense of imperfect self-defense. Despite these instructions, the jury returned a second-degree murder verdict, which is inconsistent with imperfect self-defense. If the jury rejected the imperfect self-defense theory, it is logical to conclude that it would also reject the full self-defense theory. *See, e.g., Schad v. Arizona,* 501 U.S. 624, 647–48, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). Consequently, even assuming error due to the failure to give a self-defense instruction, the error would be harmless.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

der, the judge asked Mr. Outlaw: "Are you abandoning self-defense?" Defense counsel did not respond directly to the question: "What I intend to argue before the jury is that the Government is relying on all the evidence that it [introduced] in its case in chief and that includes the [video]tape." The trial judge then told defense counsel that if he made a self-defense argument, the jury would receive instructions regarding second-degree murder and manslaughter, but that if counsel did not argue self-defense, he "probably would just give" the second-degree murder instruction. The trial court continued to inquire whether defense counsel would request a self-defense instruction. Defense counsel finally stated: "I will request self-defense." The trial judge pointed out that Mr. Outlaw had "repudiated" the version of the shooting that he gave during his videotaped statement.

At trial, Mr. Outlaw testified that he saw another person shoot the decedent. The judge took the position that even if the defense relied on the version of events given by Mr. Outlaw on the videotape, he would not be entitled to a self-defense instruction because he walked away and then returned with a gun and shot the decedent. The judge added: "[T]he best you can get in this case would be an instruction that where somebody actually but unreasonably believes that he's in danger of imminent bodily harm or death, that he can be convicted of manslaughter rather than murder." The trial judge gave a manslaughter instruction. In addition, after the jury posed a question regarding premeditation, deliberation and mitigating circumstances, the judge provided clarification of his instructions, including an explanation of imperfect self-defense.