George L. BAILEY, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–977, 00–CO–1371.

District of Columbia Court of Appeals.

Argued April 24, 2002.

Decided Sept. 18, 2003.

Mindy A. Daniels, appointed by the court, for appellant.

Matthew P. Cohen, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., Michael D. Brittin, and Howard R. Sklamberg, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and REID, Associate Judges.

TERRY, Associate Judge:

Appellant Bailey was charged with various offenses arising out of events that

resulted in the murders of Andre Briscoe, Kimberly Smith, and Henry Bost. After a six-day jury trial, he was convicted on two counts of first-degree burglary, two counts of possession of a firearm during a crime of violence ("PFCV"), two counts of armed robbery, three counts of first-degree felony murder, two counts of first-degree premeditated murder, assault with intent to kill while armed ("AWIKWA"), and assault with a dangerous weapon ("ADW"). On appeal from these convictions, he argues (1) that the cumulative effect of improper comments made by the prosecutor during his opening and closing statements, together with the prosecutor's pervasively leading questions, prejudiced his defense; (2) that there was insufficient evidence to convict him of AWIKWA and ADW; and (3) that several of his convictions merge. While his direct appeal was pending, appellant also filed a motion under D.C.Code § 23–110 (2001) asserting that his trial counsel rendered ineffective assistance. After a hearing, the trial court denied the motion. Appellant then noted a second appeal, which we consolidated with the first.

We hold that the prosecutor's comments, although they sometimes crossed the line of propriety, do not warrant a new trial and that there was sufficient evidence to sustain appellant's conviction of AWIKWA. In addition, we affirm the trial court's denial of appellant's § 23–110 motion. We also hold, however, that there was insufficient evidence to support appellant's conviction of ADW (though the evidence was sufficient to convict him of the lesser included offense of simple assault) and that some of his convictions merge. We therefore affirm the convictions on the merits (except for the ADW, which we reduce to simple assault) and remand the case to the trial court for resentencing.

## I

### A. The Murders

Roy Irby owned a house on Pleasant Street, S.E., which he operated as a "crack house," a place where people would come to buy and use crack cocaine. Appellant was the primary seller of crack cocaine at that house over a period of six or seven months in the latter part of 1994. On Saturday morning, December 10, 1994, two men broke into Mr. Irby's house while all of its occupants were asleep. One of the men (later identified as appellant) was slightly taller than the other, but both were about six feet tall and were wearing blue jump suits and black face masks. Mr. Irby and two other men, Percy Settle and Edward Judge, were sleeping on two couches and a chair in the living room. One by one, the two intruders woke them up at gunpoint and ordered them to disrobe, surrender various personal items, and lie down on the couch or the floor. The intruders then covered the three with blankets to prevent them from seeing, but Mr. Judge was able to adjust the blanket that covered him so that he could see through a hole in it.

A short time later, Andre Briscoe knocked at the door of the house. Although the hostages heard the knocking, appellant did not respond until his accomplice walked in front of him, waved to him, and repeated, "Somebody's at the door." Appellant then told Briscoe to go around to the back door. When Briscoe entered through the back door and was confronted by one of the intruders, he said, "I'm not going for this shit, man." A fight ensued, and Briscoe was killed.[1] The intruders

1. The medical examiner found five stab wounds and thirteen smaller incisions in Mr. Briscoe's body. He concluded that those wounds were caused by a single-edged knife

brought his body into the living room, and appellant said to the hostages, "That's what happens to mother fuckers that buck on me."

The intruders then started rummaging through the first floor rooms until they heard Sharon Smith, another occupant of the house, moving around upstairs. They ordered Mr. Judge to call Ms. Smith downstairs, and when she came down, they took her pocketbook, ordered her to lie on the floor with the others, and put a blanket over her. In addition to Ms. Smith, two other men joined the hostages on the living room floor that morning. Johnny White, Jr., and Anthony Chisley both came to visit Mr. Irby, one shortly after the other. When they arrived and knocked on the door, they were sent around to the back. Once at the back door, they were brought inside and ordered to strip and lie on the floor, where they too were covered with blankets.

After the intruders had everyone under control in the living room, they went to the second floor and brought down the two remaining residents of the house, Henry Bost and Kimberly Smith. Mr. Bost and Ms. Smith had been sleeping in a room upstairs. Once they were downstairs, appellant stated, "These are the mother fuckers we want, the ones we're looking for." [2] Then, with Kimberly Smith pleading for her life and offering to "pay him" and "make it up," appellant stabbed her repeatedly. [3] After a short time, he turned to Henry Bost, who was lying face down on the floor, and stabbed him multiple times. [4] When appellant ceased stabbing Bost, Mr. Judge, fearing that he would be next, sprang up and jumped through the front window, taking appellant with him. Appellant stabbed Mr. Judge in the leg, but Judge was able to escape, clad only in a pair of boxer shorts. Appellant chased him up an alley for about half a block until Judge managed to give him the slip. Judge then flagged down a passing police car, told the officers inside what had happened, and directed them to Roy Irby's house. The two intruders, however, fled from the house before the police arrived. Mr. Judge, in fear for his life, went to a bus station later that day and caught a bus out of town. He eventually made his way to Tampa, Florida, where he remained for several weeks. [5]

The next day, the police received a 911 call from a man who said his name was

and that they were consistent with a knife later recovered by the police near the scene of the crime.

2. There was evidence that both Bost and Smith owed appellant money as a result of drug transactions. Even though these debts were fairly small, appellant talked about the money that Bost owed him "all the time," according to Evette Tinch, one of the government's main witnesses. Ms. Tinch, herself a drug user, acknowledged that she had "a relationship" with appellant which enabled her to obtain cocaine from him for her own use. She testified that she also engaged in drug trafficking along with appellant and that she kept the records of his drug transactions "because of how he was about his money.... If you even owed him a dollar, he will bring you down for a dollar."

3. Ms. Smith's body had seventeen stab wounds and thirteen incisions. These wounds were also consistent with the single-edged knife found by the police.

4. Mr. Bost's body had seven stab wounds and several abrasions. According to the medical examiner, the abrasions could have been caused by being hit with the butt of a gun, and the stab wounds were caused by a single-edged knife consistent with the one found by the police.

5. Mr. Judge testified that he treated his stab wound on the bus: "I drunk a pint of vodka, soaked it in vodka, took a needle and thread and sewed it."

"Mike" and claimed to have information about the murders in Mr. Irby's house. The caller stated that on the night before the crime he had given two blue jump suits to "Kebe" and "Larry," who had told him they were going to commit a robbery. The police had, in fact, discovered a bag containing two blue jump suits, ski masks, a burgundy jacket, and a knife a short distance from Irby's house on the day of the crime. Investigating officers were able to trace the jump suits, which were Unifirst work uniforms, to appellant through his former employer. A few days later the police approached appellant and questioned him about the suits. During the interview, appellant admitted that he had made the 911 call and identified the jump suits and the burgundy jacket as his, stating that he had left the jacket at Mr. Irby's house on a recent visit. He also identified "Kebe" and "Larry" as Keith Robinson and Thomas Harley.[6] Acting on this information, the police arrested Robinson and Harley. They were both released the next day, however, after the police concluded that neither of them was involved in the murders.[7]

In January 1995 Mr. Judge returned from Florida and was interviewed by Detective Gregory Archer of the Homicide Branch of the Metropolitan Police. He told Archer that he recognized appellant as the taller of the two intruders from his voice and his behavior, and he positively identified appellant's photograph from an array of photographs. The police then arrested appellant and charged him with the murders. Mr. Judge was later placed in the witness protection program.

### B. The Trial

The government presented testimony from several witnesses who were familiar with Mr. Irby's house. All of them stated that it was a crack house. They also testified that appellant was the main supplier of crack to visitors at the house and that he was a stickler for money. Several of the witnesses said that Henry Bost owed appellant a small amount of money during the weeks before his death, and that they had heard appellant threaten to kill Mr. Bost if he did not pay his debt.

Evette Tinch was one of the witnesses who testified about Mr. Irby's home and the fact that it was a crack house. Ms. Tinch helped appellant with his drug business at the house, keeping detailed records of the sales and of how much each purchaser owed (see note 2, *supra*). She acknowledged that she also had an intimate relationship with appellant despite the fact that she was romantically involved with another man.[8] Although she was not present at the house when the murders occurred, she was there the previous night. On that night, Ms. Tinch testified, appellant was wearing a blue jump suit, a black knit cap, and a burgundy jacket, and she identified some of the articles of clothing found by the police near the scene of the crime as the ones she saw appellant wearing. Ms. Tinch also stated that appellant was carrying a silver handgun similar to one that the hostages described as used by the intruders. Deborah Conyers, another

---

6. Evette Tinch testified that appellant disliked both Robinson and Harley, and that each of them owed appellant money.

7. Mr. Robinson and Mr. Harley are, respectively, 5'5" and 5'7" tall—about six inches shorter than the witnesses' description of the intruders. Both Robinson and Harley also had alibis, including the fact that Robinson

was seen at a store by one of the surviving victims within minutes after the crime had occurred.

8. That man was Keith Robinson, one of the two men who had initially been arrested for the murders.

frequent visitor at Mr. Irby's, also saw appellant that night and corroborated Ms. Tinch's testimony.

Several of the people who were held hostage at the house that morning testified that appellant was of the same height and build as the taller of the two intruders. Additionally, Percy Settle said that one of the intruders was wearing a burgundy jacket under his jump suit that was similar to appellant's, and Johnny White stated that after the murders he saw appellant's brother in possession of a distinctive watch that the intruders had taken from him. Finally, Mr. Judge identified appellant in court as one of the intruders, even though both men wore masks. He explained:

Well, I have been seeing George Bailey every day for months, listening to him talk and have conversations with various people, sitting at a table with him, listen to him talking about Henry [Bost] and different things. And I recognized his voice.

Mr. Judge and other witnesses testified that appellant had a hearing problem, which was consistent with the fact that the taller of the two intruders could not hear the knocking at the door when Mr. Briscoe arrived. As Mr. Judge described the situation, "[T]his other guy had to get his attention. He didn't seem to hear when someone was knocking on the door." [9]

Appellant himself did not testify, but he presented an alibi defense through the testimony of friends and relatives. According to those witnesses, he spent the night with his girl friend, and in the morning he went with his brother to borrow a truck from a friend. When the truck was unavailable, appellant spent time at the home of his girl friend's daughter while his brother at-

tempted to obtain a truck from another source.

Before the case went to the jury, the court granted a judgment of acquittal on six counts of armed robbery and three counts of felony murder based on those robbery counts. The government also dismissed one of the three PFCV counts. The jury acquitted appellant of the premeditated murder of Mr. Briscoe but found him guilty on all the remaining counts that it considered.

### C. The Post–Trial Motion

Nearly three years after his convictions, appellant filed a motion under D.C.Code § 23–110 asserting that his trial counsel (now deceased) had been ineffective. Although appellant found fault with several aspects of counsel's performance, his main contention was that counsel had failed to cross-examine Mr. Judge about several alleged inconsistencies between his trial testimony and his statements to the police. After a hearing,[10] the court denied the motion. The court expressed concern about counsel's performance, but concluded that "there is not a reasonable probability that any error affected the outcome of this trial."

### II

■■■ Appellant argues that the cumulative effect of allegedly improper comments and actions by the prosecutor, both in his opening and closing statements and during the trial in the form of leading questions, was so prejudicial as to require reversal. In effect, appellant contends that the trial court abused its discretion by failing to grant a mistrial for these im-

---

9. At trial appellant wore two hearing aids, which the judge ordered him—over defense counsel's objection—to display to the jury.

10. Because the trial judge had recently retired, the hearing was held before a different judge who had no prior contact with the case.

proprieties or, at a minimum, by failing to take more rigorous corrective measures to remedy them. *See Irick v. United States,* 565 A.2d 26, 33 (D.C.1989). In evaluating such claims, we must first determine "whether any or all of the challenged comments by the prosecutor were improper." *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991); *accord, e.g., Harris v. United States,* 602 A.2d 154, 159 (D.C.1992) (en banc); *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989). If they were, then, "viewing the remarks in context," we must consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case in determining whether the comments resulted in "substantial prejudice." *McGrier,* 597 A.2d at 41 (citation omitted). The test for substantial prejudice is essentially the same as analysis under the harmless error rule: whether, "after pondering all that happened without stripping the erroneous action from the whole," we can conclude that the judgment was not substantially swayed by the error. *Id.; see Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

### A. *The Alleged Improprieties*

Appellant contends that the prosecutor acted improperly in three respects: (1) by making improper comments during his opening statement; (2) by persistently asking leading questions throughout the trial, even after the judge ordered him to stop; and (3) by making an improper comment in his closing argument.[11]

### 1. *The Opening Statement*

■ "The purpose of an opening [statement] is to give the broad outlines of the case to enable the jury to comprehend it. It is not to poison the jury's mind against the defendant ...." *Government of the Virgin Islands v. Turner,* 409 F.2d 102, 103 (3d Cir.1968). Thus an opening statement should not be argumentative, *see Wright v. United States,* 508 A.2d 915, 921 (D.C.1986) ("the court may curtail an opening statement that becomes argumentative or inflammatory" (citations omitted)), nor should it appeal to the passions and sympathies of the jury. *See Hill v. United States,* 367 A.2d 110, 113 (D.C. 1976). In addition, an opening statement generally should not refer to facts that will not be presented as evidence, although "[t]he law does not require that opening trial statements be completely supported by evidence introduced during the trial." *Mares v. United States,* 409 F.2d 1083, 1085 (10th Cir.1968), *cert. denied,* 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969), quoted in *Owens v. United States,* 497 A.2d 1086, 1091 (D.C.1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). So long as the unproduced evidence is "not touted to the jury as a crucial part of the prosecution's case," a limiting instruction from the trial court is usually a sufficient cure for any possible

---

11. The government contends that certain of the comments of which appellant now complains were not challenged at trial and should therefore be examined only for plain error. *See McGrier,* 597 A.2d at 41. Appellant asserts in response that his counsel made numerous objections during the opening statement and that, after his last objection, the trial judge told him that further objections were unnecessary. Appellant also notes that although his counsel did not object to every leading question in order to avoid annoying the jury, he had alerted the trial judge to his view that the leading questions were pervasive. Given these consistent objections, we agree with appellant and conclude that the propriety of all the comments and questions was adequately preserved for appellate review.

prejudice. *Frazier v. Cupp*, 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

In this case, the prosecutor began his opening statement with a description of the events of December 10, 1994, and then discussed the circumstances surrounding the investigation into the murders. Defense counsel objected four times during the prosecutor's statement; the court overruled three of the objections.[12] Appellant now maintains that numerous remarks made by the prosecutor in his opening statement were improper because they referred to facts that were never proven by evidence, appealed to the sympathies of the jury, and were argumentative.

■ Appellant first challenges statements that Roy Irby was "now in a nursing home" and that he "never recovered" from the incident. He argues that the government did not offer any evidence of these facts and that they were intended to garner sympathy from the jury. The government concedes that no evidence was introduced concerning Mr. Irby's present whereabouts or state of health (Irby did not testify), but it maintains that whether Irby was still suffering from the effects of the incident or was in a nursing home was not crucial to the case, nor was Irby's status "touted" to the jury. *See Frazier*, 394 U.S. at 736, 89 S.Ct. 1420. Indeed, Mr. Irby's present condition was only touched upon near the beginning of the opening statement and was never mentioned again over the course of a six-day trial. We find no prejudice warranting reversal. Although the statement was improper because there was no evidence to support it, the impropriety was slight and only tangentially related to the issues at trial.

■ Appellant next complains of the comment that the intruders entered the house "through the back door" because no evidence was ever presented to show how the intruders gained access to the house. All the doors had been locked the night before, and there was no evidence of a forced entry. The government argues, however, that the jury could infer that the visitors entered through the back door because the front door was barricaded throughout the morning and visitors were instructed to use the back door instead. On this record such an inference is entirely plausible. The evidence was sufficient to enable the jury to infer that the intruders entered through the back door, and thus there was nothing improper about this comment.

■ Appellant also disputes the prosecutor's statement that the hostages were unclear as to the amount of time that passed while they were being held hostage.[13] Appellant claims the statement was argumentative because it "set[] up excuses in advance for witness discrepancies that may have been brought out on cross . . . ." We cannot agree. Contrary to appellant's contention, the prosecutor's statement did not assert, or even allude to, any discrepancies in the witnesses' testimony; it simply noted that witnesses would not be able to give an accurate account of the time. Such a statement is not argumentative or improper.

■ Appellant next complains about several comments during the latter part of the prosecutor's opening statement, when

---

12. The court made no ruling on counsel's first objection, but cautioned the prosecutor to refrain from arguing or repeating himself.

13. The statement was: "Some time passed. How much is unclear. Those people who were there on the floor, hostages, if you will, of these intruders, their concern was not for time. It was for their lives."

he was discussing the course of the police investigation. Some of these comments are troubling. First, appellant criticizes the prosecutor's characterization of the investigation as "a monumentally difficult task" because the police had to "focus on some false facts ... put in their path by [appellant]." Defense counsel objected to this statement and moved for a mistrial. The trial judge denied the motion, but noted that the prosecutor was focusing too much on a "glorification of the investigation" and urged him to describe the investigation without "describing its heroism and the difficulties of it all." We agree with the trial judge that the prosecutor's characterization of the investigation came close to the limits of permissible comment, but it did not cross the line, nor was it serious enough to warrant a mistrial. The course of the investigation was not central to the government's case, and the comment did not seriously prejudice the defense.

■ The prosecutor then went through some of the facts that were known to the police and said that the jury could draw several inferences about the murders based on those facts. After stating that Mr. Irby's home was a crack house, the prosecutor said that this fact "suggested that perhaps these murders were drug-related." Additionally, from the actions and words of the intruders, the prosecutor suggested that the perpetrators knew at least two of the victims and that the killings might have been related to drug debts. These remarks resemble a closing argument more than an opening statement. Although it is certainly proper for the prosecutor in any case to alert the jury to the facts that the government expects to prove during the trial, the manner in which the prosecutor did so in this case was unduly argumentative. Instead of saying simply that the government intend-ed to prove that the murders were drug-related or that the murderers knew their victims, the prosecutor urged the jury to draw inferences based on the facts he had already recounted. Asking a jury to draw such inferences is not a proper function of an opening statement.

Nevertheless, the prejudice to the defense was slight. Most importantly, the inferences argued by the prosecutor were ultimately supported by the evidence. Moreover, the context of the comments mitigates to a large extent the argumentative tone, in that the prosecutor was attempting at this point to explain to the jury how the police had zeroed in on appellant as a suspect. Although it would have been preferable for the prosecutor to construct his opening statement in such a way as to avoid these argumentative inferences, his failure to do so did not result in any significant prejudice to the defense.

■ Continuing his discussion of the police investigation, the prosecutor also described the alibis of Mr. Robinson and Mr. Harley, the two men originally arrested for the murder, as "airtight." Appellant contends that this characterization was improper, and we agree. While it is true that both men had alibis, the strength of those alibis—their "airtightness"—was a matter for the jury to decide and should not have been the subject of comment by the prosecutor in his opening statement. Once again, however, this comment was an isolated remark, and the resulting prejudice, if any, was negligible.

■ Finally, appellant challenges the prosecutor's exhortation of the jurors to be attentive during the trial "out of respect for the three individuals who lost their lives." Appellant argues that this statement appealed to the sympathy of the jury by subtly hinting that he was responsible for the murders. We agree that this remark should have been left unsaid, but in

context we do not think it was unduly prejudicial. We note that the prosecutor only asked for the jurors' "undivided attention" and did not ask them to "send a message" to the defendant, something we have repeatedly condemned. *See, e.g., Crutchfield v. United States,* 779 A.2d 307, 319 (D.C.2001); *Bowman v. United States,* 652 A.2d 64, 71 (D.C.1994).

### 2. *Leading Questions*

 In addition to the allegedly improper comments during his opening statement, appellant maintains that the prosecutor acted improperly by repeatedly asking leading questions of his own witnesses throughout the trial. "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." FED. R. EVID. 611(c). The purpose of prohibiting leading questions on direct examination is to "avoid the evil of supplying a false memory for the witness." *Green v. United States,* 121 U.S.App. D.C. 111, 112, 348 F.2d 340, 341 (citations omitted), *cert. denied,* 382 U.S. 930, 86 S.Ct. 321, 15 L.Ed.2d 342 (1965); *see Scott v. United States,* 412 A.2d 364, 371 (D.C. 1980). The trial court, however, has fairly broad discretion to allow leading questions to be asked, and reversal is usually not required if the record shows that the court exercised that discretion. *Green,* 121 U.S.App.D.C. at 112, 348 F.2d at 341. The record in this case clearly and repeatedly demonstrates that the trial judge was alert to the possibility of prejudice and acted appropriately.

Defense counsel made approximately sixty-four objections to leading questions in the course of the trial; the trial judge

sustained forty-two of those objections, but frequently remarked that counsel was objecting to matters of little or no importance. Appellant also asserts that there were numerous questions that were leading to which his counsel did not object because he did not want to annoy the jury. For example, the prosecutor asked such questions as "Did you go in through the front door of the house?"; "Did you do what you could, along with Officer Downing, to secure [the scene]?"; "With glasses, do you have good vision?"; "Did you remain under that blanket until the ordeal ended?"; and "Was the watch special to you?"

Defense counsel, on four separate occasions, requested a mistrial due to the prosecutor's excessive leading questions. On the last occasion, the judge called a recess in the trial in order to discuss proper questioning with the prosecutor. The prosecutor denied that he was asking leading questions.[14] The judge replied, "I don't believe that any of these instances, either taken separately or as a whole, have begun to come to the point where they are denying Mr. Bailey a fair trial. I do find that there's a problem that I'm having trouble managing, and I don't know what to do about the disagreement [with the prosecutor] about what's a leading question and what isn't a leading question."

 Although the frequency and persistence of the prosecutor's leading questions gives us some concern, we agree with the trial judge that they did not, either individually or collectively, result in any meaningful prejudice to the defense. Many of them concerned "preliminary" information or were deemed not consequential by the judge. Additionally, the wit-

---

**14.** In this he was clearly mistaken. A leading question is traditionally defined as one that suggests its own answer, especially "a question that may be answered by a mere 'yes' or 'no.' " BLACK'S LAW DICTIONARY 897 (7th ed.1999). Many of the prosecutor's questions fit this definition.

nesses generally corroborated one another through their testimony, indicating that the prosecutor was not supplying the witnesses with "false memor[ies]." *See Green*, 121 U.S.App.D.C. at 112, 348 F.2d at 341. As a result, any prejudice caused by the prosecutor's leading questions was not substantial enough to arouse in us any real doubt about the fairness of the trial.

### 3. *Closing Argument*

During his rebuttal closing argument, the prosecutor attempted to encourage the jurors to draw on their collective experience as citizens of a large metropolitan area. In doing so, he said:

> You are a remarkable jury in the sense that you are richly diverse.
>
> Up to twelve of you who will be sitting in this case, four of you are men and eight of you are women. Of those twelve, you range in age from twenty-nine to sixty. Thirty-one years separates the youngest from the oldest member. Three of the twelve of you reside in Northeast, nine reside in Northwest, two of you work in Southwest.
>
> None of you, as far as I can tell, live or work in Southeast, the part of this city where these awful crimes were committed. You have a range of job experience. You work for Howard University, the United States Information Agency, for the World Bank. One of you is retired. One of you works for the Department of Transportation. One of you [works] for the University of Maryland. One of you is a banker with Nations Bank.

Defense counsel objected, asserting that the prosecutor's statements "terrorized" the jury. The trial court sustained the objection, but denied defense counsel's subsequent motion for a mistrial based on these comments. Appellant now argues that the comments were improper in that they violated that sanctity of juror anonymity and gave the government a hidden advantage by identifying a "mutuality of economic and class status."

 These statements by the prosecutor were clearly improper and should not have been made. Although there is nothing inherently wrong in seeking to draw on the collective experience of the jury, there was no need for the prosecutor to recite the occupation and residence of any individual juror. That information was totally irrelevant to the issues at trial and may well have made some jurors very uncomfortable. The prosecutor took a great risk by breaching the anonymity that, as a general rule, is designed to shield individual jurors from harassment. The government suggests that the prosecutor's comments "were invited by a highly rhetorical" closing argument by defense counsel. That is true to some extent,[15] but it does not justify what the prosecutor did here. We cannot agree with the assertion in the government's brief that "the prosecutor's observation was entirely benign." Once again, however, we conclude that the impropriety was not severe enough to warrant reversal. The statements came during the rebuttal portion of a long closing argument, after a long trial, and they were not related to the evidence in the case. Appellant has not persuaded us that they made any real difference in the outcome of the proceedings.

### B. *Cumulative Prejudice*

 Appellant urges us to weigh the cumulative effects of these improprieties and, having done so, to reverse his conviction. Although we agree that the prosecutor more than once crossed the border

---

**15.** *See United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

between proper and improper comment, we are not convinced that his comments would justify reversal even when considered as a whole. Most of the improprieties were minor and were not related to appellant's guilt or innocence. Moreover—and this, in our view, is particularly significant—the trial judge was very attentive to defense counsel's repeated concerns and objections, especially to the many leading questions. The judge also instructed the jury that statements by the lawyers during opening and closing arguments were not evidence and that their "questions themselves aren't evidence." Finally, and importantly, the government had a strong case. Appellant had previously threatened to kill Mr. Bost; he was seen on the evening before the crime wearing the same clothing as one of the intruders; he admitted owning the jump suits and the burgundy jacket found near the crime scene; he possessed a gun similar to the one used by the intruders; he made a 911 call (using a false name) with dubious information about the crime, which the jury could readily infer was designed to lead the police astray; and he was positively identified in court by one of the victims, who recognized his voice because he had heard it "every day for months." Given such powerful evidence, we are satisfied that the prosecutor's lapses did not improperly influence the outcome of the trial. *Cf. United States v. Somers,* 496 F.2d 723, 738 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).

## III

Appellant challenges the sufficiency of the evidence supporting his convictions of assault with intent to kill while armed ("AWIKWA") on Mr. Judge (count X of the indictment) and assault with a dangerous weapon ("ADW") on Mr. Irby (count Y). In assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, keeping in mind the jury's right to determine credibility and to draw reasonable inferences from the evidence. *Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991); *Lawson v. United States,* 596 A.2d 504, 509 (D.C.1991). "It is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury." *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976) (citations omitted). With these long-established principles in mind, we consider appellant's contentions.

### A. *Assault with Intent to Kill While Armed*

■ To convict someone of AWIKWA, the government must prove that the defendant committed an assault, that he did so with the specific intent to kill, and that he was armed with a dangerous weapon. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Nos. 4.09, 4.03 (4th ed.1993). Intent is often inferred from surrounding circumstances. *See Gray v. United States,* 585 A.2d 164, 165 (D.C.1991); *United States v. Bridges,* 139 U.S.App. D.C. 259, 261, 432 F.2d 692, 694 (1970). In this case, appellant argues that there was insufficient evidence to permit the jury to infer that he intended to kill Mr. Judge when he stabbed him.

■ The evidence showed that Mr. Judge was stabbed by appellant during a struggle while attempting to escape from the house. Just before Mr. Judge's escape, appellant had brutally and fatally stabbed Ms. Smith and Mr. Bost. Earlier that morning appellant had killed Mr. Briscoe for merely resisting the intruders' demands, and then had told Mr. Judge, "That's what happens to mother fuckers

that buck on me." Taking these facts in the light most favorable to the government, we hold that there was adequate evidence to enable the jury to infer that appellant intended to kill Mr. Judge as Judge was attempting to escape. Specifically, from the fact that appellant had already killed three people, one of whom had merely "buck[ed]" on him, the jury could reasonably infer an intent to kill any of the other occupants of the house who might attempt to countervail his wishes or to disobey an order (*e.g.*, an order to remain lying on the floor). *See Lee v. United States*, 699 A.2d 373, 383–384 (D.C.1997) (jury could find that defendant intended to commit assault and robbery when he entered a house from the fact that he assaulted and robbed the occupants almost immediately after he entered).

**B.** *Assault with a Dangerous Weapon*

■ ADW requires proof that an assault occurred [16] and that it was committed with a dangerous weapon. *Williamson v. United States*, 445 A.2d 975, 978–979 (D.C. 1982). Whether an object used in the assault is a dangerous weapon is a question of fact for the jury. *Id.* at 979; *see also, e.g., Arthur v. United States*, 602 A.2d 174, 177–178 (D.C.1992).

■ In this case, Mr. Settle, who was lying next to Mr. Irby on the couch, testified that Irby was hit in the head by appellant after telling Mr. Bost, "Just do what the man said, Henry, and you'll be all right." Mr. Settle did not see appellant strike Mr. Irby, but he felt Mr. Irby sit up and then heard a "lick." Immediately

thereafter, Mr. Irby sat back down. This evidence, we hold, was sufficient to sustain a conviction of assault, but not ADW. There was no evidence that appellant struck Mr. Irby with any sort of weapon. Although Mr. Settle testified, "I think they was pistol-whipping Henry [Bost]," that statement was objected to by defense counsel, and the objection was sustained by the trial judge. The prosecutor never followed up on the question, so the alleged "pistol-whipping" could not properly be considered by the jury. Because Mr. Settle did not actually see Mr. Irby get hit, he could not testify as to what object, if any, appellant might have used to strike him.[17] Thus the government failed to prove that a weapon was used, and appellant's ADW conviction must be reduced to simple assault, a lesser included offense of ADW. *See Gathy v. United States*, 754 A.2d 912, 919–920 (D.C.2000) (reducing conviction of greater offense to lesser included offense); *Zellers v. United States*, 682 A.2d 1118, 1122 (D.C.1996) (same); *Austin v. United States*, 127 U.S.App. D.C. 180, 191–194, 382 F.2d 129, 140–143 (1967) (same).

**IV**

■ Appellant contends, and the government agrees in part, that several of his convictions merge. We hold that appellant's two convictions of first-degree burglary while armed (counts B and C) merge with each other, *see Stewart v. United States*, 490 A.2d 619, 626 (D.C.1985); that appellant's felony murder convictions regarding Ms. Smith (count Q) and Mr. Bost

---

16. The jury was instructed only on attempted-battery assault. The government appears to concede that the lack of an instruction on intent-to-frighten assault, *see Robinson v. United States*, 506 A.2d 572, 574 (D.C.1986), precludes affirmance of the conviction on the ground that the evidence was sufficient to prove an assault of that type.

17. Although the medical examiner testified that Mr. Bost had abrasions consistent with blunt force trauma, this evidence was not sufficient to support an inference that a dangerous weapon was used to assault *Mr. Irby.*

(count T) merge with the respective pre-meditated murder convictions regarding Ms. Smith (count S) and Mr. Bost (count V), *see Byrd v. United States,* 510 A.2d 1035, 1037 (D.C.1986) (en banc); and that appellant's conviction of felony murder for the killing of Mr. Briscoe (count N) merges with the convictions of first-degree burglary upon which it was predicated (counts B and C), *see Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991). We therefore vacate all of the sentences and remand the case to the trial court for resentencing. *See Thorne v. United States,* 471 A.2d 247, 249 (D.C.1983).

Appellant also argues, however, that his two PFCV convictions merge, citing our decision in *Morris v. United States,* 622 A.2d 1116, 1129 (D.C.), *cert. denied,* 510 U.S. 899, 114 S.Ct. 270, 126 L.Ed.2d 221 (1993), which holds that two convictions of PFCV merge when the underlying offenses also merge. The government contends that the PFCV convictions do not merge and that *Morris* is distinguishable. We agree with the government.

■ In *Stevenson v. United States,* 760 A.2d 1034 (D.C.2000), this court held that multiple convictions of PFCV do not merge so long as they are not predicated on a "single violent act." *Id.* at 1036. We have adopted the "fork in the road" test to determine whether two convictions are based on the same act: "If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment ...." *Id.* at 1037 (quoting *Spain v. United States,* 665 A.2d 658, 660 (D.C.1995)); *accord, e.g., Gardner v. United States,* 698 A.2d 990, 1002–1003

(D.C.1997); *Owens,* 497 A.2d at 1096–1097.

■ In the case at bar, one of appellant's PFCV convictions is predicated on the first-degree burglary charge, while the other is based on the armed robbery charges relating to Mr. Judge and Mr. White. Unlike the convictions in *Morris,* these underlying convictions do not merge because they involve different victims. *See Stevenson,* 760 A.2d at 1035 n. 2; *Hanna v. United States,* 666 A.2d 845, 855 (D.C.1995). Furthermore, the evidence also shows that the underlying convictions were not based on a single violent act. Appellant came to a fork in the road after he committed the burglary by entering the house. At that point, he had the opportunity to stop and reconsider his decision to continue in his criminal enterprise. *See Stevenson,* 760 A.2d at 1037–1038. That moment was his fork in the road.. He could have turned around and left the house, but instead he elected to proceed with the robberies. Because the robberies and the burglary were not part of a single violent act, the PFCV convictions upon which they were predicated do not merge.

### V

Appellant also appeals from the denial of his § 23–110 motion claiming ineffective assistance of counsel. To succeed on such a claim, appellant must show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense in such a way as to undermine confidence in the outcome of the case. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. 2052.[18]

---

**18.** Appellant's motion was filed almost three years after his trial. In the interim, appel-

## A. *Failure to Cross–Examine Mr. Judge*

The bulk of appellant's ineffective assistance claim is based on the notion that his trial counsel failed to conduct any meaningful cross-examination of Edward Judge even though he had numerous grounds on which to impeach Mr. Judge's testimony. Mr. Judge was arguably the government's key witness: only he was able to peer from underneath his blanket to see what was happening, and only he was able to identify appellant as the murderer. Appellant characterizes Mr. Judge as someone who came across as very sure of himself and argues that his counsel had significant impeachment evidence available which would have undermined Judge's credibility. We are not persuaded.

Appellant first contends that counsel should have cross-examined Mr. Judge about his identification. At trial Mr. Judge stated that he was able to identify appellant as the intruder because "I recognized his voice." In his statement to the police, however, Mr. Judge said that the taller intruder was wearing a device to alter his voice [19] and that he was not able to match a face with the voice until several weeks later. Appellant also notes that Mr. Judge told the police that Mr. Robinson pressured him about the identity of the intruders before he talked to any police officer.

Although these facts may undermine Mr. Judge's identification of appellant in some measure, they are not sufficient to cast doubt on the outcome of the trial.

The government had a strong case against appellant even without Mr. Judge's identification testimony. Appellant owned the blue jump suits; he was seen wearing one of them on the night before the murders; he was of the same height and build as the taller of the intruders; and he admitted that he made the 911 call, using a false name. Additionally, Mr. Judge was not equivocal in his identification of appellant. He identified photographs of him to the police; he identified him in open court before the jury; and he stated, "There is no doubt in my mind about [appellant's] being the person that was there." Although the facts offered by appellant in his § 23–110 motion may weaken Mr. Judge's identification to a certain extent, we are not convinced that they undermine it to such a degree that there was a significant chance of a different outcome in the trial.

Appellant also criticizes his trial counsel for failing to cross-examine Mr. Judge about his motive for testifying. At trial Mr. Judge stated that he returned to the District of Columbia after leaving town because he had nightmares which caused him to come back and "turn myself in to the police department." But, according to the police investigation report, Mr. Judge was arrested for violating his probation and agreed to discuss the murders only after that arrest. [20] Mr. Judge also told the police that the reason he did not come to them immediately after the murders was that he was concerned about his parole violation, not that he was afraid of appellant as he testified at trial. Although some of these facts might have been useful

lant's trial counsel died and was therefore not available to testify at the hearing. Although this fact is not dispositive, it is worth mentioning that we have rarely, if ever, found ineffective assistance when counsel has not gone on record with his reasons for the way he conducted the trial.

**19.** Mr. Settle also testified before the grand jury that the intruder's voice was muffled. He made no mention of this at trial.

**20.** Mr. Judge also stated, however, that he called the police at his wife's urging twice before his arrest, but that he hung up the phone after he was put on hold.

for impeachment, appellant has not shown that the outcome of the trial would have been different had the jury learned this additional information. As we have pointed out, the government had a strong case, and Mr. Judge never wavered in his identification of appellant.

Appellant next claims that his trial counsel should have questioned Mr. Judge about the details of his account of the murders. At trial Mr. Judge testified that the intruders were wearing gloves and that the handle of the intruder's knife was brown. Mr. Judge initially told the police, however, that the intruders were not wearing gloves and had "stubby fingers." He also said that the knife handle was white. These discrepancies, in our view, involved only minor details and would not have affected the outcome of the trial. Moreover, these details do not relate to the voice and behavior of the intruders—including, in particular, the fact that the intruder who committed the murders was hard of hearing, as was appellant. Those were the characteristics that enabled Mr. Judge to identify appellant, whom he had seen "every day for months, listening to him talk and have conversations with various people." Counsel's failure to cross-examine Mr. Judge on these minor points did not cause any significant prejudice to appellant's case.

Finally, appellant argues that his trial counsel should have confronted Mr. Judge about a statement he made alleging that appellant raped Kimberly Smith before he killed her. Appellant correctly points out that there was no information to support such an allegation in the medical examiner's report. Mr. Judge's statement about the rape, however, came as a non-responsive answer to a question by the prosecutor, and the prosecutor (wisely) never followed up on it. Additionally, appellant was not charged with rape, and any suggestion of rape was immaterial to the crimes with which he was charged. For these reasons we conclude that counsel's failure to cross-examine Mr. Judge on this point had no effect on the outcome of the trial.

## B. *Other Assertions*

▪▪ Appellant also contends that his counsel was ineffective in other respects. First, he asserts that counsel was deficient for failing to cross-examine several government witnesses about their bias against appellant. Several of the government witnesses were close friends of one another and did not get along with appellant, including Keith Robinson (whom appellant initially accused of the murders), Evette Tinch (who was romantically involved with Mr. Robinson), and Deborah Conyers. Appellant also points out that many of those witnesses would no longer owe him drug debts if he were incarcerated. Although the bias of the government witnesses was an important point for cross-examination, enough information about their potential biases had already been brought out by the government on direct examination. Further questioning by appellant's counsel would have added little or nothing of substance to what the jury had already heard.

▪▪ Appellant maintains that his counsel was deficient in failing to ask Mr. Settle whether he knew if Mr. Bost and Ms. Smith were indebted to other individuals. In his grand jury testimony, Mr. Settle stated that he believed the killing was a contract on Mr. Bost and Ms. Smith because they had a reputation for robbing people. Appellant claims that his counsel should have brought this information out at trial. Despite Mr. Settle's testimony to the grand jury, however, such evidence—suggesting that the murders of Bost and Smith might have been committed by "a

hypothetical, unidentified person who may have had a motive"—would not have been admissible. *See Gethers v. United States,* 684 A.2d 1266, 1271–1272 (D.C.1996), *cert. denied,* 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997); *see also Winfield v. United States,* 676 A.2d 1, 4–5 (D.C.1996) (en banc). Consequently, counsel's failure to ask Settle about the debts of Bost and Smith did not prejudice appellant.

▪ Appellant argues that his counsel should have emphasized the intruders' lenient treatment of Sharon Smith, who was the sister of Keith Robinson. Ms. Smith was never ordered to disrobe as the other hostages were, and appellant argues that the gentler treatment afforded her by the intruders implicates Mr. Robinson in the criminal enterprise. Such an implication is, at best, tenuous and ultimately speculative. Moreover, given the strong case against appellant, it is highly unlikely that the alleged leniency shown to Sharon Smith, even if counsel had flagged it for the jury's attention, would have had any significant effect on the verdict.

▪ Next, appellant contends that counsel was deficient in failing to request a second-degree murder instruction with regard to the stabbing of Mr. Briscoe. He speculates that since the jury acquitted him of the premeditated murder of Mr. Briscoe and found him guilty only of felony murder, it may have likewise acquitted him on the felony murder charge and found him guilty of second-degree murder if given the opportunity. We reject this contention. Regardless of whether a second-degree murder instruction would have been appropriate on the facts presented,

there was surely sufficient evidence to support a conviction of felony murder.[21] Appellant cannot now speculate that the jury might have ignored that evidence and found differently if it had been given a second-degree murder instruction. *See Nelson,* 601 A.2d at 595.

▪ Finally, appellant alleges that his counsel prejudiced his case by giving a deficient closing argument. Counsel's closing argument consisted mainly of a fable warning the jurors not to rush to judgment on circumstantial evidence and reminding them of appellant's alibi defense. Appellant argues that counsel should instead have addressed or contested the points made by the prosecutor in his summation, and in particular that counsel should have explained why appellant gave a false name during the 911 call. Although reasonable persons may disagree about the effectiveness of counsel's argument, we cannot say that it was so inadequate or deficient as to put the outcome of the trial in doubt. Indeed, as the government stresses, the "rhetorical device [of the fable] aided in driving home [counsel's] theme—that careful consideration of all the evidence would compel acquittal." The fact that it did not result in a total or partial acquittal was not counsel's fault, but rather was due to the government's strong case.

Considering all of these allegations together, we agree that the performance of appellant's trial counsel, although it may raise some questions about counsel's tactics, was not so prejudicial as to entitle appellant to relief under D.C.Code § 23–110.[22] The evidence of guilt was strong.

---

**21.** Appellant does not contest the sufficiency of the evidence on any of the murder counts.

**22.** The government argues that counsel's performance was not deficient because all of appellant's specific claims of ineffective assistance involved tactical decisions in which "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The government

Appellant, the primary seller of crack cocaine at Mr. Irby's house, had threatened to kill Mr. Bost over a drug debt, and the intruders were specifically looking for him and his girl friend, Kimberly Smith, who offered to "pay" and "make it up" before she too was killed. Appellant was of the same height and build as one of the intruders; he had a hearing deficiency consistent with the behavior of one of the intruders; he owned and was seen wearing, just hours before the crime, a blue jump suit like the ones the intruders wore; and he possessed a gun similar to the one used in the crime. Finally, Mr. Judge identified appellant as one of the intruders by his voice and mannerisms and by the fact that he had seen appellant at Irby's house "every day for months" before the murders. Despite inconsistencies in his reports to the police and his grand jury testimony about some of the details of the event, Mr. Judge never wavered in his identification of appellant; indeed, he told Detective Archer at the outset of the investigation, "When I heard his voice, I knew the voice right off"—even before he could recall appellant's name. Given all of the evidence, we find ourselves in full agreement with the trial court's conclusion that "there is not a reasonable probability that any error [by counsel] affected the outcome of this trial."

## VI

We affirm all of appellant's convictions on the merits, except that we hold that his ADW conviction must be reduced to simple assault, for the reasons stated in part III–B of this opinion. We also affirm the

denial of appellant's § 23–110 motion. We vacate all of appellant's sentences and remand the case to the trial court for resentencing in accordance with part IV of this opinion, and for sentencing *de novo* on the conviction of simple assault as a lesser included offense of ADW under count Y of the indictment.

*So ordered.*

further points out that Mr. Judge was a highly sympathetic witness and that there was a very real possibility that harsh cross-examination could inflame the jury against appellant. *See United States v. Clayborne,* 166 U.S.App. D.C. 140, 146, 509 F.2d 473, 479 (1974) (the decision to cross-examine is "peculiarly one for

defense counsel"). Although counsel's performance was at times unusual, we refrain from deciding whether it was deficient because we are satisfied that appellant has not shown prejudice. *See Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.