Russell T. CRAWFORD, Appellant

v.

UNITED STATES, Appellee.

No. 01–CF–269.

District of Columbia Court of Appeals.

Argued June 3, 2003.
Decided Sept. 27, 2007.

---

1148

Kenneth H. Rosenau, appointed by the court, Washington, for appellant.

Suzanne G. Curt, Assistant United States Attorney, for appellee. Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Thomas J. Tourish, Jr., Douglas K. Klein, and John P. Gidez, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ and REID, Associate Judges, and TERRY, Senior Judge.[*]

TERRY, Senior Judge:

After a jury trial, appellant was convicted of second-degree murder while armed and various weapons offenses.[1] On appeal he contends that his rights under *Miranda*[2] and the Fifth and Sixth Amendments were violated, that his statement to the police was erroneously admitted into evidence in violation of the *Mallory–McNabb* rule,[3] and that certain conduct by the prosecutor prejudiced his case and requires reversal. We find all of appellant's arguments without merit and affirm the judgment.

## I

At about 4:30 a.m. on July 9, 1999, Michael Day was talking with another man known as "John–John"[4] at the corner of Third and L Streets, S.E. Robin Holliday, who knew both men, walked over to them and exchanged a few words while taking out her trash.[5] Two unidentified women then approached Mr. Day asking for drugs. After they gave him some money, Mr. Day began walking toward a green dumpster located nearby while Ms. Holliday and the two women remained standing at the corner. John–John also walked away. Moments later, Ms. Holliday heard four gunshots. After hesitating for a minute or two, she started to walk in the direction of the dumpster, and as she drew nearer, she heard someone crying for help. She headed toward the source of that cry and found Mr. Day, partially clothed and bleeding, lying on the steps in front of a house at 323 K Street, S.E. He had been shot and had stumbled onto a neighbor's front porch, where Ms. Holliday found him. She immediately called out for assistance.

After staying with Mr. Day for a few minutes, Ms. Holliday decided to look for someone from his family, who lived in the apartment beneath hers. As she headed back to her apartment building, Ms. Holliday was passed by a heavy-set man in a white T-shirt and jeans who was "running at a little pace" and appeared to be hiding something underneath his shirt. Just as

---

[*] Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. Appellant was acquitted of first-degree felony murder while armed and attempted robbery while armed, for which he had also been indicted.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

4. Although several of the government's witnesses said that John–John was present shortly before the shooting, the record does not reveal his last name, nor does it indicate why neither party called him to testify.

5. A few hours earlier, according to Ms. Holliday's testimony, several neighborhood residents were playing craps on the same street corner. Included in that group were appellant and Michael Day, who won a large sum of money from appellant. There were also rumors in the neighborhood that the two men were at odds with each other over gambling debts owed by appellant to Mr. Day.

he went past her, the man exclaimed, "Somebody better help that boy." She testified that this man looked like appellant, whom she had known for about three or four years. Ms. Holliday and Mr. Day's uncle soon returned to the wounded Mr. Day, and there they waited for the police and an ambulance.[6]

After the police arrived, Detective Steven Slaughter began to interview Ms. Holliday. As they were talking, appellant walked by, wearing the same clothing that Ms. Holliday had seen a few minutes earlier, and asked her, "Is the [man] dead yet?" About ten minutes later, appellant appeared again and asked if "Mike" was dead. On this last occasion, Ms. Holliday noticed that appellant had changed his clothes. Detective Slaughter asked appellant whether he wanted to make a statement concerning the shooting, but appellant answered, "Hell no," and walked away.[7] The police then drove Ms. Holliday to the First District police station, where she gave a written statement.

Another neighborhood resident, Joseph Matthews, was on his way home in the early morning hours of July 9 when he saw Mr. Day and a group of other persons gambling on the sidewalk across the street from his apartment. After entering his home and preparing for bed, Mr. Matthews heard an argument outside. He looked out the window and saw Mr. Day, appellant, and John–John standing on the corner. Appellant had a pistol in his hand and was arguing with Mr. Day about money. As the argument continued, Mr. Day took off his shirt and was in the process of removing his trousers when Mr. Matthews heard a gunshot, which he said was fired after Mr. Day had lunged at appellant and been pushed backwards. Mr. Matthews ducked and then heard about four more shots. As he peered out his window, he saw appellant and John–John running away, while Mr. Day stumbled onto a nearby porch. When Mr. Matthews saw appellant in the neighborhood the next day, appellant said that he "didn't mean to shoot him, and that's it," and that he was going to turn himself in to the police.[8]

Sylvester Summers, who lived about two blocks from the scene of the shooting, echoed the testimony of Mr. Matthews. He said that he saw two men "tussling, wrestling" in the early morning hours of July 9 as he was walking home after a night out. At first Mr. Summers paid little attention to the two men, but after hearing a gunshot, he looked at the men and saw that "the taller guy" had a gun in his hand. Uncertain about what to do next, Mr. Summers continued toward his home, but when he heard another shot, he ran into a neighbor's yard and hid for several minutes. Upon re-emerging, Mr. Summers saw Mr. Day leaning against a fence, trying to hold himself up. Although Summers did not know appellant by name

6. Mr. Day was later taken to a nearby hospital, where he was pronounced dead at 5:29 a.m. A deputy medical examiner testified that he had died as a result of severe bleeding caused by a gunshot wound to the abdomen, which had perforated a major vein. He had also been shot through the left hand and in the left thigh. From the nature of the wound on his hand, the medical examiner concluded that Mr. Day was grabbing at the barrel of the gun when it was fired.

7. Detective Slaughter testified that while he was interviewing Ms. Holliday, appellant approached and said something, but he could not recall what it was. When appellant approached the second time, he asked Ms. Holliday if she knew where "Mike" was. When Detective Slaughter started to speak with him, however, appellant quickly walked away.

8. Despite what he told Mr. Matthews, appellant never turned himself in. He was arrested four months later on a warrant.

on the day of the shooting, he positively identified him at trial as the gunman.

After interviewing several eyewitnesses, the police obtained a warrant for appellant's arrest on November 8, almost four months after the shooting. On November 12 Detective Don Sauls picked up appellant, who was in custody on an unrelated charge, and brought him to the First District police station for questioning. When appellant was told he had been taken into custody in connection with the death of Michael Day, he responded that he was in jail on the date of the murder.[9] After being advised of and waiving his *Miranda* rights, appellant spoke with several detectives but offered little information. However, after being told by Detective Robert Saunders that witnesses had reported that he acted in self-defense on the night in question,[10] he replied, "You guys don't have any witnesses. There was nobody back there but me and Michael."

Only after appellant requested and was granted permission to speak with Detective Michael Fulton did he give a more detailed version of what happened.[11] During his conversation with Detective Fulton, appellant described a confrontation he had had with Mr. Day on July 8 about Day's alleged sale of drugs to one of appellant's drug customers. Later that evening, appellant claimed, Mr. Day hit him with a gun without any reason. A struggle then ensued, in the course of which the gun discharged several times. Appellant also told the detective that during the struggle he tried to stab Mr. Day with a knife.

When asked if he had attempted to rob Mr. Day, appellant said he "didn't have time to take his money." He added that there were no other witnesses and that someone else must have picked up the gun, which was never recovered.

## II

■■■ In reviewing the denial of a motion to suppress evidence, this court accepts the trial court's factual findings unless they are clearly erroneous or not supported by the record. *Ball v. United States,* 803 A.2d 971, 974 (D.C.2002); *Powell v. United States,* 649 A.2d 1082, 1084 (D.C.1994); *see* D.C.Code § 17–305(a) (2001). Moreover, the facts and all reasonable inferences therefrom must be viewed in the light most favorable to sustaining the trial court's ruling. *See Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc). "Essentially," this court's role in reviewing the denial of a motion to suppress "is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991) (citation omitted); *accord, e.g., Thompson v. United States,* 745 A.2d 308, 312 (D.C.2000).

In his motion to suppress, appellant challenged the admissibility of the statements he made to the police on several grounds, and on appeal he presents the same arguments. First, he contends that his Fifth and Sixth Amendment rights to counsel were asserted in open court, but were later disregarded at the station house

9. At trial, however, the government and the defense stipulated that appellant was not incarcerated at any time on July 8 or 9, 1999.

10. Detective Saunders admitted in his testimony that he "wasn't even aware of the facts in the case" and that he had made up the story about witnesses in order to see what appellant would say.

11. Detective Fulton did not testify about the conversation he had with appellant. However, Detective Saunders, Fulton's partner, who watched the interview on closed-circuit television in the next room, memorialized the conversation by writing it down and testified to its substance at trial.

when detectives questioned him without the presence of his attorney. Second, appellant asserts that he never knowingly or intelligently waived his *Miranda* rights before being questioned by the police. Finally, he maintains that he was not presented in court until after the permissible time limit under the *Mallory* and *McNabb* line of cases and that any statements made during that period of unnecessary delay should therefore be held inadmissible. After an evidentiary hearing, the trial court denied appellant's motion to suppress. We find no error in that denial.

### A. Sixth Amendment Right to Counsel

Appellant argues, first, that because his counsel at an unrelated probation revocation hearing asserted his rights under the Fifth and Sixth Amendments when the judge learned of appellant's outstanding warrant in this case, his subsequent statements to the police detectives should be suppressed.

■ The Sixth Amendment to the Constitution provides generally that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *See McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Sweet v. United States,* 756 A.2d 366, 377–378 (D.C. 2000). However, this right "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, [or] . . . arraignment.'" *McNeil,* 501 U.S. at 175, 111 S.Ct. 2204 (citation omitted); *accord, Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (Sixth Amendment right to counsel attaches "only at or after [the initiation of] adversary judicial proceedings" (citing cases)). The Supreme Court has "never held that the [Sixth Amendment] right to counsel attaches at the time of arrest." *United States v. Gouveia,* 467 U.S. 180, 190, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *see Riley v. United States,* 923 A.2d 868, 880–881 (D.C.2007) (Sixth Amendment right does not attach at time of arrest; filing complaint to obtain arrest warrant is "not the same formal charge[] of which *Kirby* speaks").

■ According to the evidence at the suppression hearing, Detective Sauls on November 8, 1999, obtained an arrest warrant for appellant. On November 10 appellant appeared in the Superior Court before Judge Russell Canan in an unrelated case and was ordered held without bond because of a possible violation of probation. Judge Canan was then alerted to the fact that appellant was the subject of an outstanding arrest warrant for the murder of Michael Day. No proceedings concerning the warrant were held before Judge Canan, but appellant's counsel at the probation revocation hearing, James McCloud, asserted in open court appellant's Fifth and Sixth Amendment right to counsel with respect to the murder charge. The following day, November 11, Detective Sauls learned that appellant was in custody for a potential violation of probation, and on November 12 Sauls picked him up and brought him to the First District police station for questioning.

At the suppression hearing, Mr. McCloud acknowledged that when he asserted appellant's right to counsel, no formal proceedings in the murder case had yet begun. We agree with the trial judge's observation that Mr. McCloud acted prematurely (but commendably) in invoking appellant's Sixth Amendment right to counsel because, as *Kirby* and *McNeil* make clear, that right had not yet attached *in this case.* Mr. McCloud's attempt to assert appellant's Sixth Amendment right

in this case at the probation revocation hearing had no legal effect because appellant's presence in the courthouse was unrelated to the murder charge.[12] *See Texas v. Cobb,* 532 U.S. 162, 167–168, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) (Sixth Amendment right to counsel is "offense-specific" (citing *McNeil,* 501 U.S. at 175–176, 111 S.Ct. 2204)). Moreover, from the mere fact that the purported assertion of a Sixth Amendment right occurred in open court, it does not follow that formal adversarial proceedings had begun concerning the murder charge. This would be true even if the two cases were "factually related," and here they were not. *See Cobb,* 532 U.S. at 167–168, 121 S.Ct. 1335; *see also Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ("to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities"); *In re A.L.M.,* 631 A.2d 894, 899–900 (D.C.1993) (appointment of counsel for a juvenile in a prior case did not preclude the police from questioning him about an unrelated murder).

Appellant relies primarily on *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), to support his claim that his Sixth Amendment right to counsel was violated. But *Minnick* is distinguishable, both on its facts and in its reasoning. The defendant in *Minnick* challenged the admission of a statement that he made to the police after speaking to his attorney, arguing that he had never waived his *Miranda* rights. A state court held that because he had consulted with his attorney, the statement could be admitted despite *Miranda,* and ruled that *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), was "inapplicable." The Supreme Court reversed, holding (as it had previously held in *Edwards*) that once an accused requests counsel during an interrogation, all questioning must cease and cannot be resumed without counsel present. 498 U.S. at 150–151, 111 S.Ct. 486. We agree with the government that *Minnick* is inapposite to appellant's present Sixth Amendment claim, since it involved only *Miranda* and the Fifth Amendment and, as the government states in its brief, "did not affect Sixth Amendment jurisprudence in any way." [13]

For these reasons, we hold that there was no violation of appellant's Sixth Amendment right to counsel.

### B. *Fifth Amendment Right to Counsel*

 Appellant's claim that his Fifth Amendment rights were violated is equally unavailing. For an individual to gain the protection of the Fifth Amendment right to counsel in a situation such as the one presented here, two conditions must exist. First, the accused must be in custody; second, the accused must be under interrogation. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602; *see Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (*Miranda* protections attach only after a person is in custody and subject to custodial interrogation "or its functional equivalent"); *Jones v. United States,* 779 A.2d 277, 281 (D.C.2001) (en banc) ("there must be both 'custody' and 'interrogation' at the same time" before *Mi-*

---

**12.** In saying this, of course, we certainly intend no criticism of Mr. McCloud; on the contrary, we agree with the trial judge that he acted commendably.

**13.** Although the petitioner in *Minnick* also raised a Sixth Amendment claim, the Court expressly did not reach it. *See* 498 U.S. at 150, 111 S.Ct. 486.

*randa* can apply). Furthermore, these rights cannot be invoked in anticipation of a custodial interrogation. *See McNeil,* 501 U.S. at 182 n. 3, 111 S.Ct. 2204.

 We need not decide whether an attorney can invoke the Fifth Amendment rights of his client while representing him in a separate matter because appellant was not subjected to interrogation until after he was taken to the First District police station for questioning. Once there, appellant was properly read his *Miranda* rights and voluntarily signed a police department form waiving them. Interrogation then followed. Because the invocation of his Fifth Amendment rights was made before they were legally available—*i.e.,* before he was in custody *in this case* and subject to interrogation—no possible violation of those rights occurred. The proper time to invoke his Fifth Amendment right was prior to the police questioning at the station house, not at the courthouse during an unrelated hearing. *See McNeil,* 501 U.S. at 182 n. 3, 111 S.Ct. 2204 ("Most rights must be asserted when the government seeks to take the action they protect against").

### C. *Waiver of Miranda Rights*

Appellant also challenges the trial court's finding that the waiver of his *Miranda* rights was voluntary. Because appellant had little formal education, he maintains that his waiver was not "know-

ing and intelligent." This argument is without support in the record.[14]

 It has long been established that statements made by a suspect while in police custody are inadmissible unless the police advise him of his *Miranda* rights prior to interrogation. *See Miranda,* 384 U.S. at 479, 86 S.Ct. 1602; *see also, e.g., Lewis v. United States,* 483 A.2d 1125, 1127 (D.C.1984).[15] However, under *Miranda* the suspect may waive his rights and give a statement to police. *See, e.g., In re M.A.C.,* 761 A.2d 32, 35–36 (D.C. 2000). When a defendant later challenges the admissibility of such a statement, "the government has the burden of proving that the waivers of the privilege against self-incrimination and the right to counsel were made knowingly, intelligently, and voluntarily." *Id.* at 36 (citations omitted); *see Miranda,* 384 U.S. at 475, 86 S.Ct. 1602. "The voluntariness of the *Miranda* waiver is to be determined by reference to the totality of the circumstances with consideration given to appellant's previous experience with the legal system as well as his sophistication in matters of a criminal nature." *Madison v. United States,* 512 A.2d 279, 282 (D.C.1986) (citation omitted).

 Detective Sauls testified that, while at the police station, he advised appellant of his rights from a PD–47 "rights card." On the card there was a space for appellant to answer yes or no to each of the following questions: (1) "Do you understand your rights?" (2) "Do you wish

---

**14.** Evidence of appellant's limited education was presented only at his sentencing hearing, not during the hearing on the motion to suppress. His present argument was not made at all in the trial court; consequently, it can be considered on appeal only if a miscarriage of justice would otherwise result. *See, e.g., Johnson v. United States,* 619 A.2d 1183, 1187 n. 8 (D.C.1993) ("an argument not made before the trial court cannot be invoked on appeal except to prevent manifest injustice"). While we do not find that a miscarriage oc-

curred in this case, we nevertheless analyze appellant's claim and reject it on the merits.

**15.** These rights include "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602.

to answer any questions?" and (3) "Are you willing to answer any questions without having an attorney present?" When he finished reading the card, appellant wrote the word "yes" in the blank following each question, wrote his initials after each "yes," and then signed the card at the bottom. Detective Garvey also signed the card, and Detective Sauls witnessed his signature.

There was no evidence that appellant was coerced or tricked into signing the PD–47. *See United States v. Brooks*, 125 F.3d 484, 492 (7th Cir.1997) (coercion is one factor relevant in determining the voluntariness of a waiver). Nor was there any other evidence from which the court could find that his *Miranda* waiver was involuntary. Given appellant's prior experience in the criminal justice system [16] and the testimony of Detectives Sauls and Garvey about the signing of the PD–47, we have no reason to question the trial court's finding that he was aware of his *Miranda* rights and waived them knowingly and voluntarily.[17] *See Madison*, 512 A.2d at 282.

### D. *Timeliness of Presentment: Mallory–McNabb*

Appellant was held in custody for three days before being formally presented on a murder charge in connection with Michael Day's death.[18] He argues that this was an undue delay in violation of Super. Ct. Crim. R. 5 and the *Mallory–McNabb* rule.

Criminal Rule 5(a) states that an arrested individual must be presented before a judicial officer "without unnecessary delay." This court has consistently held, however, that a valid waiver by an accused of his *Miranda* rights is also a waiver of his right under *Mallory* and *McNabb, supra* note 3, to presentment without unnecessary delay. *See Bond v. United States*, 614 A.2d 892, 899 (D.C.1992) (citing cases); *accord, e.g., Outlaw v. United States*, 806 A.2d 1192, 1200 (D.C.2002); *United States v. Bell*, 740 A.2d 958, 963–964 (D.C.1999). Indeed, that has been the law in this jurisdiction since shortly after the *Miranda* decision came down. *See Pettyjohn v. United States*, 136 U.S.App. D.C. 69, 74, 419 F.2d 651, 656 (1969), *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970);[19] *Everetts v. United States*, 627 A.2d 981, 984–987 (D.C.1993). Furthermore, "[t]he waiver is valid even if obtained during the period of unnecessary delay." *Bell*, 740 A.2d at 963 (citations omitted).

Thus, under *Pettyjohn* and later cases, when appellant voluntarily signed

---

16. The record reveals that appellant had at least three prior convictions of drug-related offenses, as well as a conviction of assault. He was on probation for one of these offenses (it is not clear which one) at the time of the murder.

17. Although there were some minor inconsistencies in the testimony of the detectives, particularly as to whether appellant was advised of his *Miranda* rights before or after he made his spontaneous statement that he had been in jail at the time of the murder and did not learn about it until the next day, the trial court did not find these inconsistencies sufficient to discredit the testimony of any of the detectives. The court specifically held that Detective Saunders' fabricated comment

about witnesses who said that appellant shot Mr. Day in self-defense (see note 10, *supra*) did not require suppression of appellant's subsequent statements to the police.

18. Not all of those three days were attributable to the charges in the instant case. Appellant was ordered into custody on November 10 by Judge Canan for an apparent probation violation, but it was not until November 12 that Detective Sauls executed the warrant charging him with murder. He was presented in court on the murder charge on the morning of November 13.

19. *Pettyjohn* is binding on this court under *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

the PD–47 card waiving his *Miranda* rights, he also waived his right to presentment without unnecessary delay. The fact that this waiver may have been obtained during a time that might, under other circumstances, be considered a period of unnecessary delay is of no consequence once a waiver has occurred. *See Bell,* 740 A.2d at 963. Even absent the valid waiver, the delay between appellant's detention and presentment was not so extreme as to violate his rights. *See, e.g., Bond,* 614 A.2d at 901 (voluntary confession made thirty-six hours after arrest, during a sixty-two hour presentment delay, was nevertheless admissible). As the trial court found, when appellant finished his statement to the police on November 12, it was too late in the day for him to be brought before a magistrate. Appellant was presented the following morning, which was the next available time.

We therefore hold that there was no violation of the *Mallory–McNabb* rule or Criminal Rule 5.

### III

Appellant argues that the prosecutor engaged in conduct that prejudiced his case before and during his trial, and that the trial court should have sanctioned the government for this improper behavior. In particular, appellant asserts that the prosecutor (1) impermissibly consulted with a witness during a recess, in violation of the court's instruction, (2) made improper comments during his opening and closing statements to the jury, and, among other things, (3) persistently made use of leading questions on direct examination. After reviewing the extensive record, we find no basis for reversal. Although the prosecutor may have crossed the line into forbid-

den territory on a couple of occasions, his transgressions were relatively minor, and any potential prejudice was quickly cured by the alert and attentive trial judge. We are not persuaded that any of the prosecutor's conduct substantially prejudiced appellant, especially when appellant's claims of impropriety are weighed against the strength of the government's case.

### A. *Discussion with a Witness*

 Appellant's primary claim of misconduct involves the prosecutor's conversation with Detective Sauls during a recess in his cross-examination at the suppression hearing. Despite an admonition from the court to Detective Sauls that he should not discuss his testimony with anyone, the prosecutor spoke with him about a mistake he had made in answering a question on direct examination about when he advised appellant of his *Miranda* rights. After the conversation was revealed, the court orally admonished the prosecutor but did not impose any sanctions. Appellant now contends that it was error for the court not to do so and claims that his counsel's subsequent cross-examination of Detective Sauls was prejudiced as a result. He also moved to strike Detective Sauls' redirect testimony in its entirety, which the court denied.

 In general, the trial court has broad discretion to determine the appropriate remedy for violations of the so-called "rule on witnesses." *See Benn v. United States,* 801 A.2d 132, 141 (D.C. 2002); *Brown v. United States,* 388 A.2d 451, 456 (D.C.1978).[20] When reviewing a decision on whether or not to permit testimony after there has been a violation of the rule, this court will reverse only for an abuse of discretion. *Bourn v. United*

---

**20.** The "rule on witnesses" is rooted in a trial judge's authority to control trial proceedings and to sequester witnesses when necessary.

*Geders v. United States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Benn,* 801 A.2d at 140–141.

*States,* 567 A.2d 1312, 1317 (D.C.1989). Testimony should normally be excluded only under extreme circumstances. *Brown,* 388 A.2d at 456 ("Generally, the violation of the court order must be so egregious that it 'has somehow so discredited the witness as to render his testimony incredible ·as a matter of law' " (citation omitted)); *see Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893).

 As the government correctly points out, the traditional remedy for a violation of a court order prohibiting witnesses from discussing their testimony with anyone else is cross-examination. *See Geders, supra* note 20, 425 U.S. at 89–90, 96 S.Ct. 1330; *Brown,* 388 A.2d at 457. In this case, Detective Sauls was specifically cross-examined about the discussion he had with the prosecutor during the break in his testimony. Appellant's present claim that his ability to cross-examine Detective Sauls was impaired because of the detective's conversation with the prosecutor is thus refuted by the record. In addition, appellant suggests a multitude of sanctions which the court could have imposed on the prosecutor for violating its order to refrain from speaking to the witness. Trial judges, however, have broad discretion in deciding what sanctions, if any, should be imposed on those who violate their orders. The draconian measures proposed by appellant, such as the declaration of a mistrial and striking the detective's testimony in its entirety, are not often used; more importantly, they do not fit the circumstances of this case. *See Benn,* 801 A.2d at 140–141 ("a witness who has violated a sequestration order may be excluded from the witness stand only under extreme and exceptional circumstances").

The need to sanction the government in this instance is especially doubtful. Appellant claims that Detective Sauls' testimony was "tainted" by his talking with the prosecutor during the break in the hearing. When the proceedings were reconvened, the prosecutor admitted that he had violated the court's order and had spoken to the witness during his cross-examination. However, on redirect the prosecutor elicited only information about a mistake in the detective's testimony on direct that he made *before* the break concerning when he advised appellant of his *Miranda* rights. Because no new information was introduced after the prosecutor spoke to the witness, there is no basis for concluding that all of his testimony was tainted or should be stricken. As the trial court stated, sanctioning the prosecutor or striking Detective Sauls' testimony was unnecessary "[b]ecause his testimony did not change on redirect from that which had already been elicited."

Appellant also refers to a violation of the purported "rule" in *Thacker v. United States,* 599 A.2d 52 (D.C.1991), to support his claim that the prosecutor's misconduct in talking to Detective Sauls should have resulted in severe sanctions. In *Thacker* this court held that the trial court did not commit plain error by failing to order, *sua sponte,* sequestration of the government witnesses. *Id.* at 60. We also went on to hold that, in light of the record, there was nothing improper about the prosecutor's contact with a government witness during the trial. *Id.* Appellant tries to expand this holding with the assertion that because the prosecutor in this case spoke with Detective Sauls in violation of the court's order, automatic sanctions should follow. Not only is this argument without support in *Thacker,* but we have found no case which holds that once an attorney violates a court order, such as one prohibiting witness contact, sanctions must follow automatically. *See Benn,* 801 A.2d at 141.

Neither *Thacker* nor any other case that we have found limits the trial court's discretion in the manner suggested by appellant.

We therefore find no abuse of discretion or other legal error in the court's failure to impose a sanction for the prosecutor's violation of its directive not to speak to the witness.

### B. *Allegedly Improper Comments*

During his opening statement, and again in his closing argument, the prosecutor referred to the murder of Michael Day in vivid terms. He noted that Mr. Day's "young life was brought to an abrupt and violent halt" and "was snuffed out by a man with an axe to grind." He further commented that Mr. Day's "life was draining, literally draining out of his body" and characterized appellant as having a "reckless disregard for human life." In one instance during his opening statement, the prosecutor expressed his personal opinion when he remarked that a particular witness' testimony would be "honest." Appellant argues that these comments should have resulted in sanctions of varying degrees against the government. Although the comments at issue may perhaps have been more colorful than is customary, and although the characterization of the witness' testimony as "honest" should have been left unsaid, any prejudice suffered by appellant was minimal at best, given the strength of the government's case and the court's curative instructions.

 Our standard of review is well established. In reviewing appellant's contentions, this court must first consider whether the prosecutor's comments were improper. *See Dancy v. United States,* 745 A.2d 259, 270 (D.C.2000); *Diaz v. United States,* 716 A.2d 173, 179 (D.C. 1998); *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). If we decide that they

were, we will then evaluate the claim of error by "viewing the [remarks] in context . . . consider[ing] the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989) (citation omitted). This court will reverse only if it can confidently say that the verdict was "substantially swayed" by the error. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see Hawkins v. United States,* 606 A.2d 753, 756–757 (D.C.1992) (reversal is justified only where the challenged conduct "bring[s] about substantial prejudice"); *McGrier,* 597 A.2d at 41; *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989). In this case, moreover, our review as to most of appellant's claims is only for plain error because—with one exception—none of the prosecutor's comments at trial elicited any objection from defense counsel. *See Chatmon v. United States,* 801 A.2d 92, 99 (D.C.2002); *McGrier,* 597 A.2d at 41 (absent an objection, reversal "is appropriate only in a 'particularly egregious' case, when 'a miscarriage of justice would otherwise result' " (citation omitted)). Finally, "although [appellant's] complaint is primarily with the prosecutor, it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick,* 565 A.2d at 33. The question we must decide, as we have said many times, is whether the trial judge erred by "fail[ing] to intervene *sua sponte* when such intervention [was] called for . . . or to react with sufficient promptness and vigor to prosecutorial misdeeds . . . and our ultimate focus must therefore be on what the judge did or failed to do." *Id.* (citations omitted).

 As this court said in *Dixon,* "[s]ome types of cases, particularly those

involving tragic death or injury, have an inherent emotional impact.... The prosecutor ... [is not] required to sanitize the government's evidence or make it appear less wrenching than it is." 565 A.2d at 76 (citation omitted); *accord, e.g., Mills v. United States*, 599 A.2d 775, 786 (D.C. 1991) ("Many of the challenged comments appear to us to have been descriptions of the evidence in an especially horrifying and gory case, and to have fallen within the limits of permissible argument"). The victim in this case was shot in the abdomen and, according to the medical examiner, bled to death as a result of his wounds. Under our case law, reference to the grim details of his death was well within the permissible bounds of comment. Moreover, the prosecutor was under no obligation to remove evidence from the jury's consideration or to lessen its impact merely because it was potentially dramatic. *See Thacker*, 599 A.2d at 60 (holding that prosecutor's references to a murder victim as having been "carved up" and "butchered" were not improper). Given the strong evidence of appellant's guilt, it is not likely that these brief comments "substantially swayed" the verdict.

■■■■ The prosecutor also offered his opinion about witness credibility during his opening statement when he said, "A witness is going to be honest with you, just like Robin Holliday, that [she] just didn't want to get involved." We have repeatedly said that "[i]t is improper for a lawyer to express a personal opinion about a witness' veracity during arguments to the jury." *McGrier*, 597 A.2d at 43 (citations

omitted). We see no reason why the same principle should not apply to opening statements, and thus we conclude that the comment was improper. But defense counsel objected, and the objection was sustained.[21] The court then told the jurors to "disregard any statements by counsel as to whether people can be believed or not."[22] Appellant insists that this curative instruction was not enough. Again, however, when the prosecutor's remark is weighed against the government's strong case, appellant's assertion that he suffered "substantial prejudice" strains logic, especially when the court told the jurors to ignore the comment seconds after it was made. *See Hawkins*, 606 A.2d at 756–757.

### C. *Leading Questions and Other Concerns*

■■■ Appellant argues that the trial court erred in failing to sanction the prosecutor for asking an abundance of leading questions on direct examination. He also offers what amounts to a detailed critique of the prosecutor's performance at trial. Included in this array of criticism is a suggestion that the trial court should have sanctioned the prosecutor for (1) failing to refresh a witness' recollection in the proper manner, (2) improperly injecting testimony while questioning a witness, (3) asking questions that provoked a hearsay response, and (4) inappropriately leaning against the jury box. Again, while some of the prosecutor's lapses could have been avoided, none of them, either individually or cumulatively, resulted in any significant prejudice to appellant.[23]

---

**21.** Even though defense counsel objected to this particular comment, thus properly preserving his claim on appeal, reversal is warranted only if appellant suffered substantial prejudice. *See McGrier*, 597 A.2d at 41.

**22.** The jurors were also told by the court at the beginning of the trial that they alone

"must decide whether to believe any witness."

**23.** Appellant also contends that a violation of the Jencks Act, 18 U.S.C. § 3500 (2000), occurred when the government claimed that a witness statement had been turned over when in fact it had not. While the government

 Although not typical on direct examination, leading questions are sometimes permissible. *See Bailey v. United States,* 831 A.2d 973, 984 (D.C.2003) (trial court "has fairly broad discretion to allow leading questions to be asked" on direct examination); *Arnold v. United States,* 511 A.2d 399, 410 (D.C.1986) ("the court in its discretion may allow counsel to probe and test a witness' recollection, even by asking leading questions"); *Jenkins v. United States,* 500 A.2d 1019, 1021 (D.C.1985) (allowing prosecutor to ask leading questions on direct examination was not an abuse of discretion); *Green v. United States,* 121 U.S.App. D.C. 111, 112, 348 F.2d 340, 341 (1965) (leading questions on direct are permissible under certain circumstances). In this case, moreover, the trial court sustained each objection made by defense counsel after a leading question. On one such occasion, the court admonished the prosecutor to "keep it non-leading," and after another such incident the court told the jury to disregard the prosecutor's question. Given these actions by the trial court, we are satisfied that if there was any potential prejudice, it was quickly cured, and appellant's right to a fair trial was protected. Here, as in *Bailey,* the record "clearly and repeatedly demonstrates that the trial judge was alert to the possibility of prejudice and acted appropriately." 831 A.2d at 984.

The remaining criticisms are not sufficiently significant to require extended discussion. Appellant has simply highlighted what were, at worst, minor mistakes by the prosecutor during the trial in the hope of showing that collectively they prejudiced the defense. He has failed to cite any supporting case law for the proposition that improperly injecting testimony while questioning a witness, asking questions that elicited a hearsay response, or momentarily leaning against the jury box should result in the sanctions he urges, let alone a reversal of his conviction. We are satisfied that these modest transgressions (if indeed they can even be called that) were "too trivial to worry about." *Scott v. United States,* 619 A.2d 917, 929 (D.C. 1993).

## IV

The judgment of conviction is

*Affirmed.*

RUIZ, Associate Judge, dissenting:

Although I am in agreement with most of the court's opinion, I disagree with the majority's reasoning that appellant's Fifth Amendment right to counsel was not violated. The underlying facts are that police questioned appellant about the murder of Day without the presence of counsel, while appellant was in custody after having been arrested for that murder. The police undertook that interrogation notwithstanding that appellant's counsel had two days earlier, with appellant by his side, asserted his Fifth Amendment right to counsel upon being informed during a court hearing that appellant was about to be arrested for the murder. I conclude that, on the facts of this case, appellant's Fifth Amendment right to counsel was properly asserted and

acknowledged that the statement at issue could have been produced earlier, it eventually turned the statement over to the defense six days before the witness testified. Thus, since subsection (b) of the Jencks Act entitles the defendant to the prior statement of a government witness only *after* the witness has testified on direct examination, there was no violation of the Act. Moreover, even if there had been a violation, automatic sanctions are not required; the imposition of a sanction, if any, is left to the discretion of the trial court. *See, e.g., McGriff v. United States,* 705 A.2d 282, 287 (D.C.1997); *Slye v. United States,* 602 A.2d 135, 138 (D.C.1992).

that the police-initiated interrogation violated appellant's right to the assistance of counsel *"in dealing with custodial interrogation by the police."* *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). As a result, appellant's statements to the police admitting that he shot Day (albeit in self-defense) should have been suppressed. As the erroneous admission of the statement was not harmless beyond a reasonable doubt, the judgment of conviction should be reversed and the case remanded for a new trial without appellant's confession.[1]

As a preliminary matter, although the majority states that it "need not decide whether an attorney can invoke the Fifth Amendment rights of his client while representing him in a separate matter," see *ante* at 1156, the Supreme Court has already settled that the offense-specific analysis applicable to the Sixth Amendment right to counsel does not apply in the Fifth Amendment context. *See Arizona v. Roberson,* 486 U.S. 675, 685, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). As the Court explained, there is a "difference between the Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination." *Id.*

> The former [Sixth Amendment right] arises from the fact that the suspect has been formally charged with a particular crime and thus is facing a state appara-

tus that has been geared up to prosecute him. The latter [Fifth Amendment right] is protected by the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation, which arise from the fact of such interrogation and exist regardless of the number of crimes under investigation or whether those crimes have resulted in formal charges.

*Id.*[2]

Because of the difference in the constitutional source and purpose of the two, the Court has held that "[o]nce a suspect invokes [under the Fifth Amendment] the *Miranda* right[3] to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *McNeil v. Wisconsin,* 501 U.S. at 177, 111 S.Ct. 2204 (citing *Roberson,* 486 U.S. at 675, 108 S.Ct. 2093). Once the right is asserted, no interrogation is permitted "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *see also Michigan v. Jackson,* 475 U.S. 625, 626, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (extending the *Edwards* rule, but limited to the charged offense, to requests for counsel under Sixth Amendment). Moreover, even if a suspect is

---

1. The government, which bears the burden of showing that any error was harmless, has not attempted to argue that admission of appellant's confession meets *Chapman's* constitutional harmless error test. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

2. For this reason I agree with the majority that appellant had no right to counsel with respect to the murder charge under the Sixth Amendment because the government had not yet initiated "criminal proceedings by way of

formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Appellant was not presented to the court on the murder charge until November 13, when a complaint was filed, three days *after* assertion of his right to counsel.

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

subsequently advised of his *Miranda* rights, any purported waiver is ineffective because

> if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" [of custodial interrogation] and not the purely voluntary choice of the suspect.

*Roberson,* 486 U.S. at 681, 108 S.Ct. 2093; *cf. id.* at 683, 108 S.Ct. 2093 (distinguishing "a suspect's decision to cut off questioning, [which] unlike his request for counsel, does not raise the presumption that he is unable to proceed without a lawyer's advice") (citing *Michigan v. Mosley,* 423 U.S. 96, 101 n. 7, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *id.* at 110 n. 2, 96 S.Ct. 321 (White, J., concurring in result)). It is of "no significance" whether the interrogating officers in fact knew that a suspect has asserted his right to have counsel present so long as notice of the assertion has been given. *Roberson,* 486 U.S. at 687, 108 S.Ct. 2093. Once *Edwards* applies to prohibit any police-initiated interrogation, whether the interrogation "concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists. The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer." *Id.* at 687–88, 108

S.Ct. 2093. *See Jackson,* 475 U.S. at 634, 106 S.Ct. 1404 (stating, with respect to Sixth Amendment right to counsel, that "[o]ne set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court).").[4]

The question that does need to be decided in this case is whether the assertion of appellant's Fifth Amendment right to counsel was ineffective because it was premature. The majority holds and the trial court concluded that "[b]ecause the invocation of his Fifth Amendment rights was made before they were legally available— *i.e.,* before [appellant] was in custody *in this case* and subject to interrogation—no possible violation of those rights occurred." See *ante* at 1156–57. This is an issue that the Supreme Court has not settled. *See id.* at 630 n. 4, 106 S.Ct. 1404 (expressing "no comment" on the validity of the argument that "defendants' request to the arraigning magistrate for appointment of counsel implicated only their Sixth Amendment right to counsel [and not the Fifth Amendment right to counsel] because the request was not made during custodial interrogation"). The statement in the *McNeil* footnote relied upon by the majority, that the *Miranda* right, like "[m]ost rights[,] must be asserted when the government seeks to take the action they protect against," is preceded by the recognition that the Court has *not* determined whether "a person can invoke his *Miranda* rights anticipatorily." *McNeil,* 501 U.S. at 182 n. 3, 111 S.Ct. 2204. This *dictum* in the Court's opinion was in response to the dissent's observation that *McNeil's* holding

---

**4.** In this case, Detective Sauls, the officer who initiated the questioning of appellant, testified that although he knew that defendants are entitled to counsel at a probation revocation hearing, he did not know-nor did he inquire of the U.S. Attorney's office or appellant-whether appellant had counsel. He also knew that appellant had been arrested and was locked up in jail on another charge. As defense counsel argued to the trial court during the motion to suppress, Detective Sauls would or should have known that appellant was represented by counsel.

that the Sixth Amendment right to counsel is offense-specific—with which the dissent disagreed—would have "slight impact" because "[i]n future preliminary hearings, competent counsel can be expected to make sure that they, or their clients, make a statement on the record that will obviate" the offense-specific limitation of the Sixth Amendment right announced in *McNeil* by asserting the right to counsel under the Fifth Amendment—the situation that obtained in this case. *Id.* at 183–84, 111 S.Ct. 2204 (Stevens, J., dissenting); *see Alston v. Redman,* 34 F.3d 1237, 1246 (3d Cir.1994) (noting that although *McNeil* footnote is "essentially *dict [um]* being a response to a hypothetical posed by the dissent, we must consider it with deference").

The limitation that the majority would place on assertion of the Fifth Amendment right to counsel as available only at the time of actual custodial interrogation is at odds with the multilayered "prophylactic" protections added by the Supreme Court after *Miranda* in cases such as *Edwards* and *Roberson.* Moreover, since those cases, the Court has made clear that the rights specified in *Miranda*—the right to be advised of the right to remain silent, the right to counsel and the right of indigent suspects to appointed counsel—"announced a constitutional rule" which it declined to overrule. *Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Although the government relies on the formulation that for "*Miranda* rights" to apply, there must be both custody and interrogation, *see, e.g., Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation"),[5] its brief recognizes, as do most

---

5. It is important to bear in mind that what *Miranda* requires is that a suspect be *advised* of his rights. *See* 384 U.S. at 444, 86 S.Ct. 1602. The underlying right to remain silent, however, arises under the Fifth Amendment's Self–Incrimination Clause, *see Bram v. United States,* 168 U.S. 532, 564, 18 S.Ct. 183, 42 L.Ed. 568 (1897), and *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (applying privilege to states under Fourteenth Amendment) (*quoted in Missouri v. Seibert,* 542 U.S. 600, 607, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)), and had been recognized long before, and exists independent of, the court's ruling in *Miranda. See Miranda,* 384 U.S. at 441, 86 S.Ct. 1602 (stating that Court was concerned with "the problems ... of *applying* the privilege against self-incrimination to in-custody interrogation) (*quoted in Dickerson,* 530 U.S. at 439, 120 S.Ct. 2326) (emphasis added)." In other words, what *Miranda* established is the right to be advised of rights and the consequence—generally exclusion of the suspect's statement in the government's prosecution—that flow from the violation of that right. *See Miranda,* 384 U.S. at 444, 86 S.Ct. 1602; *see also Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (permitting use for impeachment); *New York v. Quarles,* 467 U.S. 649, 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (recognizing limited exception for questioning to protect public safety); *United States v. Patane,* 542 U.S. 630, 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (excepting physical evidence obtained as a result of suspect's unwarned but voluntary statements). Since *Dickerson's* announcement that *Miranda's* protections are constitutionally grounded, the question arises whether the right to require the presence of counsel (whether retained or appointed), like the right to remain silent, also is deemed to be independent of the right to be advised that such a right exists, and whether the Court will countenance a prophylactic cushion for this right as well. If so, it would be *the right to be advised* (and not the suspect's right to assert his underlying right to counsel) that would be triggered only when a suspect is at risk of the coercive pressure of custodial interrogation. As the right to counsel under the Fifth Amendment is meant to protect the privilege against self-incrimination, logic would dictate that they would be concurrent and not dependent on the confluence of custody and interrogation that calls for the advice of rights. There is no need to anticipate the Court's answer to these ques-

courts that have addressed the issue in the context of the *McNeil* footnote, that assertion of Fifth Amendment rights is valid if custodial interrogation is "imminent" or "impending." *Alston,* 34 F.3d at 1245, 1249 (finding assertion premature because interrogation not "imminent" when prisoner signed form letter invoking right to counsel while sitting in his jail cell speaking with a representative of the Public Defender's office and interrogation occurred three days later); *United States v. LaGrone,* 43 F.3d 332, 339 (7th Cir.1994) ("[F]or a defendant to invoke his *Miranda* rights ... interrogation must be imminent"); *United States v. Grimes,* 142 F.3d 1342, 1348 (11th Cir.1998) (finding *Alston's* and *LaGrone's* reasoning persuasive); *United States v. Thompson,* 35 F.3d 100, 104 (2d Cir.1994) (recognizing invocation of Fifth Amendment right to counsel can be made in face of imminent custodial interrogation, but mere filing of "notice of appearance" to obtain defendant's records not valid assertion); *United States v. Wright,* 962 F.2d 953, 956 (9th Cir.1992) (assertion of right to counsel at plea hearing ineffective when suspect questioned a few weeks later about different crime; court left open whether right can be as-

serted when suspect and counsel expect interrogation about a different offense); *State v. Torres,* 330 N.C. 517, 412 S.E.2d 20, 25 (1992) ("[A]lthough an individual cannot *waive* her right to counsel prior to receiving *Miranda* warnings, a suspect in custody can certainly *assert* her right to have counsel present during her impending interrogation prior to *Miranda* warnings and the actual onset of questioning."); *see also United States v. Cooper,* 85 F.Supp.2d 1, 24 (D.D.C.2000) (finding it unnecessary to reach the issue of whether suspect had reasonable expectation of continued interrogation when right to counsel asserted by his lawyer at extradition hearing, and whether this expectation would satisfy any "imminent interrogation standard" because it was suspect who initiated discussions with police); *United States v. Barnett,* 814 F.Supp. 1449, 1453–54 (D.Alaska 1992) (invocation of rights at grand jury proceedings and appointment of lawyer insufficient to assert Fifth Amendment right).

The facts of record in this case show that appellant was in custody and his interrogation was not only foreseeable but fast approaching when appellant's rights were asserted by counsel.[6] According to

---

tions in this case, however, because even assuming that the Fifth Amendment right to counsel itself—not just the right to be advised of it—is part of the *"Miranda* rights" triggered by custodial interrogation, the assertion of Fifth Amendment rights in this case came within *Edwards's* protection because, as discussed in the text, appellant was in custody and interrogation was imminent.

**6.** Unlike the Sixth Amendment right to counsel, which is triggered by the government's institution of formal proceedings, see note 2, *supra,* the right to counsel under the Fifth Amendment must be "actually invoked," *see Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (per curiam), by making a statement "that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil,* 501

U.S. at 178, 111 S.Ct. 2204; *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that *Edwards* is triggered only when the suspect "unambiguously" requests the presence or assistance of counsel). At the suppression hearing in this case, the lawyer who represented appellant at the probation revocation hearing testified that, "I addressed the Court for the record, noting that government counsel was present, that I was asserting [appellant's] Fifth and Sixth Amendment rights in the drug [murder] matter that they were making reference to." The government does not argue that the assertion was ineffective because it was counsel and not appellant personally who asserted appellant's Fifth Amendment rights, nor does it contend that it did not meet *Davis's* requirement that the assertion be unambiguous. Although in most cases it is to be expected that

the trial court,[7] at the time appellant's Fifth Amendment rights were asserted, the judge in the probation revocation hearing had already decided appellant would be held without bond based on a report of violations of the conditions of probation (including a recent drug and firearms arrest in Maryland).[8] In addition, because the probation officer had announced that appellant was also subject to arrest for the murder of Day, the trial judge noted, "the Marshals had an obligation to secure [appellant's] presence as a result." [9] In other words, there were two separate grounds for holding appellant in custody: for violating the terms of probation and on the murder arrest warrant. Appellant was in uninterrupted custody from the hearing on November 10, when his probation was revoked (and his Fifth Amendment rights asserted); he continued to be detained at the Marshal's cell block in the courthouse on the 11th, and was picked up from there by Detective Sauls and taken to the First District police station on the morning of November 12, where he was arrested, booked, and interrogated about the murder while chained to the floor in the interview room. Counsel's prompt assertion of appellant's Fifth Amendment rights upon being informed that appellant was about to be arrested for murder can only be understood as having advised the government that it should not interrogate appellant without the presence of counsel in the reasonable expectation that the police

it will be the unrepresented suspect in police custody who invokes the right to counsel, there is no reason to disregard the usual premise that counsel speaks for the client. In this case, in particular, appellant was present when counsel asserted appellant's Fifth Amendment rights, and the reasonable inference is that counsel was voicing his client's choice. *Cf. Moran v. Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (noting, in case where appellant did not contend that he had asserted his Fifth Amendment right, that "[e]vents occurring outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right"). Recognizing the validity of counsel's assertion of a suspect's Fifth Amendment rights, moreover, does not contravene society's interest in securing reliable confessions that are free of government coercion, because, should the suspect change his mind, *Edwards* "does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." *Minnick v. Mississippi*, 498 U.S. 146, 156, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). It is only those statements made in response to interrogation initiated by the government that may not be used at trial. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

7. Although the transcript of the probation revocation hearing was introduced as an exhibit at the suppression hearing, it is not part of the record on appeal, so we do not have a transcript of what counsel actually said at the probation revocation hearing nor the sequence of events. Therefore, I rely on the testimony during the hearing on the motion to suppress and the trial court's findings, which are not disputed by the government.

8. As the government's brief acknowledges:

[T]he trial court found that (1) appellant's probation officer in the drug case had already issued a violation report and that Judge Canan had determined that appellant would be held without bond based on that report and that he also would be held in connection with a show cause order issued by another Superior Court judge; (2) Judge Canan's deputy clerk *subsequently* told the court about the pending murder arrest warrant; and (3) Judge Canan did not conduct any proceedings with respect to the arrest warrant but rather "it was just made known to him because the Marshals had an obligation to secure [appellant's] presence as a result."

(Emphasis added).

9. Although the trial judge found that appellant was in custody, she ruled that the assertion of his Fifth Amendment rights was "anticipatory" because he was not yet subjected to custodial interrogation.

would seek to interrogate appellant about the murder as, in fact, happened within less than forty-eight hours. *See Roberson*, 486 U.S. at 686, 108 S.Ct. 2093 (noting that where "a period of three days elapsed between the unsatisfied request for counsel and the interrogation about a second offense, there is a serious risk that the mere repetition of the *Miranda* warnings would not overcome the presumption of coercion that is created by prolonged police custody"). It would be passing strange if assertion of the Fifth Amendment right to counsel, which is meant to secure the presence of a lawyer during custodial interrogation, were ineffective because it is asserted by counsel who acts to protect the right of a suspect whom counsel has every reason to expect is about to be subjected to the coercive pressures *Miranda* intended to counteract. To rule that assertion of appellant's rights was premature under these circumstances raises a concern the Supreme Court has voiced, "that the suspect whose counsel is prompt would lose the protection of *Edwards*, while the one whose counsel is dilatory would not." *Minnick*, 498 U.S. at 155, 111 S.Ct. 486 (rejecting proposed ex-

ception to *Edwards* rule that police may initiate questioning without counsel present after assertion of Fifth Amendment rights if suspect has had prior consultation with counsel). It also would make the validity of a suspect's assertion of the right to counsel contingent on the vagaries of police schedules and internal rules or efficiency—all outside the control or likely knowledge of a suspect and (except in certain cases) his alert counsel.[10]

I therefore disagree that the assertion of appellant's Fifth Amendment rights was anticipatory and ineffective, because on this record appellant's rights were asserted at a time when custodial interrogation was imminent. The police were thereafter prohibited from initiating any custodial interrogation without counsel, and appellant's statements in response to interrogation at the police station in breach of that safeguard must be suppressed.[11]

---

**10.** In this case, for example, Detective Sauls learned on November 11 that appellant had been arrested and was "locked up at the D.C. jail," and on the 12th he took appellant to the First District police station from the courthouse cell block, because "we wanted to question [appellant]" about the murder of Day and the police are not permitted to interview prisoners in the U.S. Marshal's cellblock in the D.C. courthouse. Otherwise, it would appear, the police interrogation would have taken place in the courthouse cell block the day after he was taken into custody.

**11.** As noted, the trial judge did not address this precise question because she considered

that the right to counsel may be asserted only when a suspect is actually being interrogated. See note 9, *supra*. Therefore, with my colleagues' concurrence, I would have remanded for the trial judge to address in the first instance whether interrogation was "imminent." Based on the record and the trial court's findings, however, it is clear that appellant was in custody when the right to counsel was asserted and that the interrogation that in fact occurred two days later was foreseeable at the time the right was asserted.